[No. 68070-1. En Banc.]
Argued February 17, 2000.    Decided April 6, 2000.
THOMAS LENZI, ET AL., *Respondents*, v. REDLAND INSURANCE COMPANY, *Appellant*.

---

*Merrick, Hofstedt & Lindsey*, by *Ronald S. Dinning*, for appellant.

*Roger E. Hawkes* and *Kevin M. Winters*, for respondents.

TALMADGE, J. — We must decide in this uninsured motorist insurance (UIM) coverage case if an insurance carrier that has notice of its insureds' lawsuit against an uninsured tortfeasor and declines to intervene in that lawsuit is bound by a default judgment obtained against the tortfeasor. Under the facts of this case, we hold the UIM insurer is bound by the default judgment where it had timely notice of the filing of the lawsuit by its insureds and ample opportunity to intervene in the lawsuit to protect its interests, but declined to do so. We affirm the trial court's judgment and award fees on appeal to the Lenzis.

## ISSUES

1. Does a UIM insurer receive adequate notice of its insureds' lawsuit against the uninsured tortfeasor when the insureds did not inform the insurer they had served the tortfeasor and moved for default and entry of a default judgment?

2. Is a UIM insurer bound by a default judgment obtained by its insureds against a tortfeasor?

3. Are the Lenzis entitled to attorney fees on appeal?

## FACTS

Thomas Lenzi was injured in August 1995 in an automo-

bile collision. It is now uncontested that the driver of the other vehicle, Joseph Davis, was 100 percent at fault for Lenzi's injuries. Lenzi and his wife had UIM coverage with limits of $500,000 through a policy Redland Insurance Company (Redland) issued to Lenzi's company, Black Pine Enterprises, Inc., d/b/a Black Pine Specialty Auto. The UIM coverage clause of the policy read as follows:

> We will pay all sums the "insured" is legally entitled to recover as compensatory damages from the owner or driver of an "underinsured motor vehicle." The damages must result from "bodily injury" or "property damage" sustained by the "insured" caused by an "accident." The owner's or driver's liability for these damages must result from the ownership, maintenance or use of the "underinsured motor vehicle."

Clerk's Papers at 153 (the terms in quotations are defined terms in the policy).

Davis was uninsured at the time of the accident, according to the police report on the accident. He did not carry liability insurance and no other liability coverage applied to the vehicle he was driving. Davis was cited for driving without insurance. He did not take action on the citation, and never paid the $558.00 fine he was assessed.

The Lenzis reported the accident to Redland and sought personal injury protection (PIP) payments under the terms of the policy. Redland neglected to pay the Lenzis for Mr. Lenzi's medical expenses under the terms of the PIP coverage for many months. Redland finally paid the Lenzis the $2,000 maximum PIP coverage to which they were entitled under the policy for Mr. Lenzi's injuries.

The Lenzis retained legal counsel who made a demand on Redland for UIM coverage under the policy by letter dated April 9, 1996. The Lenzis' counsel asked Redland to acknowledge Davis was uninsured. When Redland did not reply, Lenzis' counsel sent a second letter. On May 22, 1996, Redland's insurance adjuster responded, declining to acknowledge Davis was uninsured.

Settlement negotiations with Redland did not progress

rapidly. By letter of November 26, 1997, the Lenzis made a formal settlement demand on Redland for $60,000. The Lenzis listed Mr. Lenzi's medical expenses as $2,535.79. Redland countered with an offer to settle of only $5,500, which the Lenzis immediately rejected. The two parties exchanged letters over the next several months dealing with Mr. Lenzi's deposition, medical authorization forms, the possibility of arbitration, and selection of arbitrators, but no further express settlement negotiations occurred. The parties did not agree to commence arbitration. Redland continued to refuse to admit Davis was uninsured, but it appointed an arbitrator on June 2, 1998. The Lenzis never appointed an arbitrator.

On September 29, 1998, the Lenzis sent Redland a letter enclosing the summons and complaint they had filed against Davis on August 17, 1998, prior to expiration of the statute of limitations. The complaint sought damages from Davis for the injuries the Lenzis suffered as a result of the 1995 accident. The summons and complaint the Lenzis sent Redland both contain a date received stamp and a stamped court docket number, indicating the complaint had actually been filed. In the letter, the Lenzis tendered to Redland "any and all rights he has in his lawsuit against Mr. Davis . . . for purposes of protecting any subrogation interest [Redland] may have against Mr. Davis in regards to Mr. Lenzi's UIM claim." Clerk's Papers at 209. The letter also noted the Lenzis had not yet served Davis. Redland took no action with respect to Lenzis' suit against Davis, other than to inform the Lenzis by letter dated October 22, 1998, it did not intend to pursue subrogation against Davis. That letter and a subsequent letter continued to refuse to acknowledge Davis was uninsured. Redland did not formally appear in the action or informally request of the Lenzis notice of any further steps they would take to prosecute the case.

Mr. Lenzi's deposition was taken by counsel for Redland on October 29, 1998. Thereafter, on November 4, 1998, counsel for the Lenzis notified Redland the Lenzis had no

further interest in mediation or arbitration. The Lenzis withdrew prior settlement demands by a letter dated November 13, 1998.

Without further notification to Redland regarding the lawsuit, the Lenzis served Davis with the summons and complaint on October 28, 1998, and obtained a default judgment against Davis totaling $212,671 on November 23, 1998, representing damages of $162,671 for Mr. Lenzi and $50,000 for Mrs. Lenzi. The trial court entered extensive findings of fact and conclusions of law to accompany the default judgment.

A month after obtaining the default judgment, the Lenzis demanded Redland pay the judgment amount, plus 12% interest from the date of the judgment. Redland refused to consider itself bound by the default judgment, listing the following reasons:

> Redlands [sic] was (1) never given notice that the lawsuit had been perfected by service, (2) not given an opportunity to defend the claim on the merits, and (3) never asked by the insured [Lenzi] to participate in the lawsuit as a defendant. . . . Redlands [sic] will not issue payment to the Lenzis based on the default judgments.

Clerk's Papers at 84. However, Redland did not seek to intervene in the Lenzi-Davis action to set aside the default judgment.

In response to Redland's refusal, the Lenzis filed the present action for declaratory judgment and damages against Redland, alleging breach of contract, bad faith, and Consumer Protection Act (chapter 19.86 RCW) violations. They also claimed attorney fees pursuant to *Olympic Steamship Co. v. Centennial Insurance Co.*, 117 Wn.2d 37, 811 P.2d 673 (1991). The parties filed cross-motions for summary judgment. Redland's motion sought dismissal of all the Lenzis' claims, or, in the alternative, an order requiring the Lenzis to arbitrate their UIM claim and dismissal of their remaining claims. The Lenzis' motion sought payment of the default judgment amounts pursuant to the

UIM coverage, prejudgment interest, costs and attorney fees pursuant to *Olympic Steamship*, actual and treble damages pursuant to the Consumer Protection Act (CPA), and a declaration that they were not required to arbitrate.

The trial court granted the Lenzis' motion for summary judgment on the claims for breach of contract and declaratory relief, binding Redland to the default judgment and declaring the Lenzis did not have to arbitrate their UIM claim and awarded Lenzi fees under *Olympic Steamship*, but denied the motions for summary judgment as to bad faith and the CPA, and dismissed the Lenzis' bad faith and CPA claims. Redland appealed from the judgment. The Lenzis did not seek review of the dismissal of their CPA-bad faith claims. We granted direct review. RAP 4.2(a).

## ANALYSIS

### A.   Notice Under the *Finney-Fisher* Rule

Our UIM jurisprudence has clearly indicated an insurer having notice of a lawsuit brought by its insured against the uninsured tortfeasor may be bound by the judgment obtained by the insured. Less than two years ago, we decided *Fisher v. Allstate Ins. Co.*, 136 Wn.2d 240, 961 P.2d 350 (1998). The question in that case was whether a UIM carrier is "bound by the results of an arbitration between its insured and the tortfeasor when the carrier did not participate but had notice and an opportunity to intervene in the action?" *Id.* at 242. Fisher was injured in a motorcycle accident, conducted an arbitration against the tortfeasor, and won an award of $236,000. The tortfeasor's insurance policy had a limit of $125,000, so the tortfeasor was underinsured. Fisher had a UIM policy with Allstate containing a $25,000 coverage limit; she demanded Allstate pay her that amount. Allstate refused, contending it could not be bound by the result of the arbitration to which it was not a party and there was, therefore, no UIM coverage.

We rejected Allstate's position. Reaffirming a 20-year-old Court of Appeals case, *Finney v. Farmers Insurance Co.*, 21

Wn. App. 601, 586 P.2d 519 (1978), *aff'd*, 92 Wn.2d 748, 600 P.2d 1272 (1979), we held a UIM carrier can protect its rights by intervening in an arbitration between its insured and a tortfeasor. Thus, so long as the carrier "has notice and an opportunity to intervene in the underlying action against the tortfeasor," it will be bound by the findings, conclusions, and judgment of the arbitral proceeding. *Fisher*, 136 Wn.2d at 246.

In *Finney*, on nearly identical facts to those present here, the Court of Appeals held that a UIM carrier that was given timely notice of the decedent insured's wrongful death action against a tortfeasor and declined to intervene in the action was bound by the findings, conclusions, and judgment entered in that case. The Court of Appeals also declined to hold the insurer was not bound by a judgment based on a stipulation where a court made findings and conclusions that were essential to entry of the judgment. Finally, the court held the insurer waived any right to contractual arbitration by its course of conduct in compelling the insured's estate to pursue a civil action against the tortfeasor. We approved of the Court of Appeals view on these issues. *Finney*, 92 Wn.2d at 750.

Multiple policy issues are at play in a UIM case like the present action. From the UIM carrier's point of view, there is concern about collusion between its insured and the tortfeasor, who may be judgment proof and have no real interest in the outcome of an arbitration or trial, leading to an artificially high award for the insured the carrier must pay.[1] Another possibility is the tortfeasor might have minimal insurance coverage, thus lessening the incentive for the tortfeasor's insurance company to defend the action vigorously, again possibly leading to an artificially high award. These are legitimate concerns.

---

[1]In the *Fisher* case, Allstate suggested collusion without presenting evidence of it: "It is Allstate's understanding that Fisher agreed [the tortfeasor's] liability would be capped at his liability insurance limits [$125,000], in return for an agreement to use a specific arbitrator. If so, [the tortfeasor] had no incentive to minimize damages once they exceeded his policy limit." Supplemental Br. of Allstate at 10 (*Fisher*).

From the insured's point of view, the insured should not have to relitigate a case depending on the whim of the UIM carrier. If, for instance, the outcome of litigation between the insured and the tortfeasor is a small award, the UIM carrier may decide simply to pay its insured rather than require a subsequent civil action or arbitration between it and its insured. On the other hand, if the outcome is a high award, the carrier may decide to force its insured to relitigate in the hope of obtaining a more favorable result. *Fisher,* 136 Wn.2d at 249.

■ The *Finney-Fisher* rule straightforwardly resolves all of these concerns. Giving the UIM carrier timely notice of litigation between the insured and the tortfeasor, and the attendant opportunity to intervene, allows the carrier to protect its interests against a collusive or otherwise artificially excessive result from that litigation. The insured is not forced to endure multiple actions to secure proper recompense for its UIM coverage.

Redland does not dispute the *Finney-Fisher* rule. Instead, Redland argues first, it did not receive adequate notice, and second, it should not be bound by a default judgment because a default judgment is not a judgment on the merits. Redland acknowledges the September 29, 1998 letter it received from the Lenzis contained a copy of the summons and complaint the Lenzis had filed against Davis. Redland argues, however, receipt of the summons and complaint was not enough to constitute sufficient notice: "Redland was never told that Davis had been served or that default judgments would be sought." Br. of Appellant at 17-18. Thus, Redland seeks a new rule that would require an insured to keep its UIM carrier apprised of specific steps the insured takes in litigation against a tortfeasor beyond just the filing of a summons and complaint.

Redland advances the notion that a lawsuit is not "perfected" until it has been served on a defendant, and therefore Redland was not at fault for not intervening when it received the summons and complaint. We do not recognize the term "perfected" in the sense Redland wishes to

employ it. Receipt of a summons and complaint alerts a potential party there is a lawsuit afoot. It seems implausible that when Redland received the summons and complaint via the Lenzis' September 29 letter it made a reasoned decision to take no action until the Lenzis served Davis. Redland simply decided it wanted no part of the Lenzi-Davis litigation at all and so advised the Lenzis.

As Redland had an interest in the outcome of the litigation, it was obliged to protect its position and to ensure receipt of all pleadings. Here, Redland received a summons and complaint it knew had been filed because of the clerk's date received stamp and the stamped docket number in the margin. Redland should have appeared in the Lenzi-Davis litigation, at a minimum. It could have intervened when it received the summons and complaint. It then would have been a party and entitled to receive all subsequent pleadings, including the Lenzis' motion for default judgment against Davis.[2]

█ Neither the *Finney-Fisher* rule nor ordinary notions of fair play and substantial justice dictate the Lenzis had any duty to Redland other than timely[3] notifying Redland of the filing of the summons and complaint. Receipt of such pleadings is sufficient to put an alert and concerned party on notice that further proceedings in which it might have an interest may occur, and that in order to protect its interests, the interested party needs to act to assure receipt of subsequent pleadings.

Redland also contends the statutory obligation of good

---

[2]CR 5(a) requires all pleadings subsequent to the summons and complaint to be served on all parties.

[3]The duty of the insured under the *Finney-Fisher* rule to provide *timely* notice of the filing of the lawsuit to the insurer is important. The insurer should be afforded appropriate time to assess the implications of the lawsuit for its coverage and to take appropriate action.

In this case, notice was timely. The Lenzis did not provide their insurer a copy of the summons and complaint only days before entry of the default. To the contrary, the letter enclosing the summons and complaint was sent on September 29. The default was not taken until November 23. Redland had ample time to appear, to intervene formally, or to request informally notice of Davis's service or the Lenzis' subsequent steps in the suit.

faith in insurance matters supports its views on a more expansive notice requirement.[4] RCW 48.01.030 reads:

> The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters. Upon the insurer, the insured, their providers, and their representatives rests the duty of preserving inviolate the integrity of insurance.

Redland argues the Lenzis "set a trap" for Redland by withholding information about service of process on Davis and obtaining a default judgment, while ostensibly continuing in a negotiation posture.[5]

Redland's reading of the statute poses the question of whether the statute applies when the insured and insurer become adversarial. From the time the Lenzis sent their settlement demand letter to Redland on November 26, 1997, the Lenzis and Redland were in an adversarial posture, possibly leading to litigation. In an ordinary litigation setting, a plaintiff has no ethical or good faith obligation to inform a defendant who has not answered or filed a notice of appearance that it will seek a default judgment. CR 55(a)(3). We decline in this case to explore the contours of this statutory duty of good faith once the UIM insurer and insured are in an adversarial posture. Suffice it to say the Lenzis' conduct here does not smack of sharp practice and does not amount to a violation of the strictures of the statute. We see no compelling reason, statutory or otherwise, to expand upon the notice requirement of *Finney-Fisher.*

In summary, we note Redland and other insurers have numerous resources at their disposal to address the concerns presented by situations like the present, ranging

---

[4]Redland does not argue the general common law duty of good faith and fair dealing in contractual matters applies here.

[5]We note the parties here had not formally invoked the policy's arbitration clause. Redland only belatedly acknowledged Davis was uninsured, after resisting such a concession repeatedly. Redland appointed an arbitrator on June 2, 1998. The Lenzis never appointed an arbitrator.

from the informal to the very formal. Redland could have appeared.[6] Even though it would not have been a party until it intervened, we think had Redland filed and served a notice of appearance, any failure by the Lenzis to notify Redland of further pleadings in the matter would be taken at the Lenzis' own peril. Redland could have contacted the Lenzis' counsel and asked for notice of when Davis was served and any further steps in the lawsuit, including entry of default. It could have written a clear policy requirement of notice as to *all* steps in the lawsuits involving its insured.[7] Redland could have formally intervened upon notice of the filing of the lawsuit and possibly even after entry of the default judgment.[8] It did none of these things. The *Finney-Fisher* rule requires only timely notice by the insured to an insurer of the insured's action against an uninsured tortfeasor and an opportunity for the insurer to intervene, not notice of all pleadings filed. We decline Redland's invitation to extend the scope of the rule here.

---

[6]CR 55 covers defaults and default judgments in detail. CR 55(a)(3) states, in pertinent part, "Any party who has not appeared before the motion for default and supporting affidavit are filed is not entitled to a notice of the motion."

[7]The policy required Lenzi to "[p]romptly send us [Redland] copies of the legal papers if a 'suit' is brought." Clerk's Papers at 155. The policy defined the term "suit" to mean "a civil proceeding in which . . . [d]amages becuase [sic] of 'bodily injury' or 'property damage' . . . are alleged." Clerk's Papers at 155. Sending copies of the legal papers to Redland is the only duty in the event of accident, claim, suit, or loss the Redland policy placed on the Lenzis relevant to this matter. Clerk's Papers at 149, 155. This provision could be read to require the Lenzis to send Redland *all* "legal papers" filed in the lawsuit, rather than just those announcing commencement of an action, but Redland does not argue the Lenzis had a *contractual* duty to send it copies of the affidavit of service on Davis and the default judgment pleadings.

[8]Default judgments are precarious and not favored because, "It is the policy of the law that controversies be determined on the merits rather than by default." *Dlouhy v. Dlouhy*, 55 Wn.2d 718, 721, 349 P.2d 1073 (1960). Moreover:

> This court has described a proceeding before a trial court to vacate a default judgment as "equitable in character and relief is to be afforded in accordance with equitable principles." *Griggs v. Averbeck Realty, Inc.*, 92 Wn.2d 576, 581, 599 P.2d 1289 (1979). In considering whether to grant a motion to vacate, a trial court "should exercise its authority 'liberally, as well as equitably, to the end that substantial rights be preserved and justice between the parties be fairly and judiciously done.'" *Griggs*, 92 Wn.2d at 582 (quoting *White v. Holm*, 73 Wn.2d 348, 351, 438 P.2d 581 (1968)).

## B.  The Preclusive Effect of a Default Judgment

Redland next argues even if it had sufficient notice and opportunity to intervene, it should not be bound by the default judgment because default judgments are not judgments on the merits. The four elements of collateral estoppel are as follows:

> (1) Was the issue decided in the prior adjudication identical with the one presented in the action in question? (2) Was there a final judgment on the merits? (3) Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication? (4) Will the application of the doctrine not work an injustice on the party against whom the doctrine is to be applied?

Br. of Appellants at 14 (quoting *McDaniels v. Carlson*, 108 Wn.2d 299, 303, 738 P.2d 254 (1987)). Redland argues a default judgment is not a final judgment on the merits, so collateral estoppel should not operate here to bind Redland. *Id.*

Redland's reliance on a collateral estoppel analysis is misplaced. Neither *Finney* nor *Fisher* based its holding on a close analysis of the elements of collateral estoppel. As the *Fisher* court noted, "The *Finney* rule, along with the rule in a majority of states, relies on collateral estoppel principles. It does not apply the doctrine's elements strictly." *Fisher,* 136 Wn.2d at 252 n.6. Rather than a strict collateral estoppel approach, *Finney* and *Fisher* referred to policy considerations as the animating force behind the *Finney-Fisher* rule. *Fisher* enumerated "[c]onsiderations of fairness and the avoidance of redundant litigation[,]" the

---

*Vaughn v. Chung*, 119 Wn.2d 273, 278-79, 830 P.2d 668 (1992). Had Redland filed a motion to intervene and a motion to vacate the default judgment after learning of it, it seems possible if not likely the trial court might have granted both motions under the unusual circumstances of the case. CR 55(c)(1) sets forth a rather lenient rule for setting aside defaults:

> For good cause shown and upon such terms as the court deems just, the court may set aside an entry of default, and, if a judgment by default has been entered, may likewise set it aside in accordance with rule 60(b).

Redland did not even try to cure its problem in the trial court.

prevention of "anomalous results," and "preventing insurers from picking and choosing their judgments" as policy reasons for the rule. *Id.* at 248.

■ Although *Fisher* and *Finney* have spoken of collateral estoppel as the applicable doctrine under these circumstances, it is more correct to note res judicata, or claim preclusion, is the operative principle. "Res judicata refers to 'the preclusive effect of judgments, including the relitigation of claims and issues that were litigated, *or might have been litigated*, in a prior action.' " *Loveridge v. Fred Meyer, Inc.*, 125 Wn.2d 759, 763, 887 P.2d 898 (1995) (emphasis added) (quoting Philip A. Trautman, *Claim and Issue Preclusion in Civil Litigation in Washington*, 60 WASH. L. REV. 805, 805 (1985)). The key consideration is Redland "might have litigated" the damages issue, but chose not to by not intervening in Lenzi's action against Davis. Thus, Redland is not so much estopped to deny coverage for damages as it is *barred* from litigating the question now. As Professor Trautman puts it, "Unlike issue preclusion [collateral estoppel], which applies only to issues actually litigated, claim preclusion applies to what might, or should, have been litigated as well as to what was actually litigated." Trautman, *supra*, at 813-14. Redland could have and should have litigated the damage claim by intervening in the Lenzis' case against Davis. Claim preclusion prevents Redland from litigating the damage award now.

Moreover, the Minnesota Supreme Court stated with considerable cogency, "The underinsurer pays, not because it is estopped by the judgment, but because it has contractually agreed to pay the judgment less the tort liability insurance recovery." *Employers Mut. Cos. v. Nordstrom*, 495 N.W.2d 855, 859 (Minn. 1993). That is, the insuring clause in the UIM endorsement promises payment: "We will pay all sums the 'insured' is legally entitled to recover as compensatory damages from the owner or driver of an 'underinsured motor vehicle.' " Clerk's Papers at 153. In this case, based on the default judgment, the Lenzis are "legally entitled to recover" $212,671 plus interest. Redland must

pay in accordance with its promise, not because it is estopped to deny its obligation to pay.

Redland also argues earnestly the default judgment should not be given effect because of concern for collusive judgments. But we decline to set aside the default judgment here as the basis for Redland's coverage. As we have noted, Redland could have intervened in the action to protect its interests. Even though the Lenzis' final settlement demand was $60,000 and the judgment exceeded $212,000, we note that settlement offers frequently do not reflect the final judgment amounts in civil cases determined by triers of fact. That differential alone does not imply a collusive judgment. More critically, the default judgment amount was set by a judicial officer (in this case, a pro tem commissioner). Just as the Court of Appeals in *Finney* found significant the trial court's entry of findings and conclusions before a judgment, we believe the commissioner's decision here as to the amount of the default judgment was an added safeguard for Redland. Judges and commissioners must not be mere passive bystanders, blindly accepting a default judgment presented to it. Our rules contemplate an active role for the trial court when the amount of a default judgment is uncertain.[9]

## C. Attorney Fees

The trial court awarded the Lenzis costs and reasonably attorney fees pursuant to *Olympic Steamship* Although Redland assigned error to the trial court's entire judgment, Redland does not now specifically argue against the award of *Olympic Steamship* fees. The Lenzis have properly set forth their entitlement to costs and fees under *Olympic*

[9]CR 55(b)(2) provides:

> If, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearings as are deemed necessary or, when required by statute, shall have such matters resolved by a jury. Findings of fact and conclusions of law are required under this subsection.

*Steamship*. RAP 18.1(a); RAP 14.2. We grant the Lenzis' request for costs and reasonable attorney fees on appeal.

## CONCLUSION

Redland received the timely notice required by the *Finney-Fisher* rule, yet did not intervene in the lawsuit between the Lenzis and the uninsured tortfeasor, Davis. Redland is therefore barred from relitigating the result of that lawsuit, even if it was a default judgment, on claim preclusion principles. We affirm the trial court judgment and award the Lenzis costs and attorney fees on appeal.

GUY, C.J., and SMITH, JOHNSON, MADSEN, ALEXANDER, SANDERS, IRELAND, and BRIDGE, JJ., concur.