**Elaine L. CHAO, Secretary of Labor, Plaintiff–Appellee,**

v.

**A-ONE MEDICAL SERVICES, INC.; Alternative Rehabilitation Home Healthcare, Inc.; Lorraine Black and Hanahn Korman, Defendants–Appellants.**

**No. 02–35158.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 9, 2003.

Filed Oct. 6, 2003.

---

910

Elizabeth Zink Pearson, Pearson & Bernard PSC, Covington, KN, for the defendants-appellants.

Lois R. Zuckerman, U.S. Department of Labor, Washington, DC, for the plaintiff-appellee.

Before: CUDAHY,* O'SCANNLAIN and GOULD, Circuit Judges.

## OPINION

CUDAHY, Circuit Judge.

The Secretary of Labor brought this suit on behalf of eight former employees of A–One Medical Services, Inc. (A–One) and Alternative Rehabilitation Home Healthcare, Inc. (Alternative) to recover unpaid overtime wages for work between July 1998 and January 2000. The district court granted summary judgment in favor of the Secretary, who was awarded both the overtime wages and an equal amount in

---

* The Honorable Richard D. Cudahy, Senior United States Circuit Judge for the Seventh Circuit, sitting by designation.

liquidated damages. We affirm in part and reverse in part.

Because this case was decided on summary judgment, we are required, as was the district court, to view all facts in the light most favorable to the defendants. *Diruzza v. County of Tehama*, 323 F.3d 1147, 1152 (9th Cir.2003). To that end, all of the facts below, unless otherwise noted, come from Lorraine Black's and Hanahn Korman's depositions, interrogatories or briefs.

As of 1996, Black and Korman independently owned and operated, respectively, A–One and Alternative, Washington state corporations engaged in the business of providing health services to patients in their homes. That year, Black entered into negotiations with Korman for A–One to purchase Alternative. Black was interested in the purchase of Alternative because she sought to obtain certain state-issued, county-specific Medicare Certificates of Need that Alternative possessed but A–One did not. These additional Certificates of Need, which were otherwise difficult to obtain, would allow Black to expand her business into Kitsap, Thurston and Pierce counties. Although the parties reached an agreement for the sale, the transaction encountered two complications. First, Alternative was behind in its taxes. As late as the time of oral argument, Alternative's outstanding tax liability still stood in the way of the deal's closing. The other problem was that Alternative, although it had the desired Certificates of Need, was not yet certified as a Medicare provider. In order to retain its Certificates of Need while being acquired, Alternative needed to be Medicare-certified prior to completion of its purchase by A–One. This second complication was remedied when Alternative's Medicare certification became effective on February 22, 1999.

In order for Alternative to successfully pass the state survey required for Medicare certification, however, it received a great deal of help from Black and A–One. According to Black, Alternative alone would have had difficulty passing the survey because Alternative had very few "Medicare-like" patients. Therefore, to facilitate the certification, Black agreed to transfer two "Medicare-like" patients from A–One to Alternative. In order to maintain continuity of care, A–One arranged for nurses to be transferred along with the patients they were serving. A–One also assisted Alternative with staffing and client supervision in preparation for Medicare certification.

The substantial merging of A–One's and Alternative's operations was not limited, however, to the cooperation necessary to secure Alternative's Medicare certification. Both before Alternative's Medicare certification and after, the two companies' operations became very closely coordinated. As Black acknowledged in her deposition, A–One oversaw the patient care of Alternative, supervised Alternative's employees, contracted accounting services for Alternative, contracted vendors for Alternative, answered Alternative's telephone calls at the office A–One shared with Alternative [1] and oversaw Alternative's paperwork to comply with government requirements. The receptionist shared by A–One and Alternative was an A–One employee, the answering service shared by A–One and Alternative was paid for by A–One, the last person to process Alternative's payroll was an A–One employee, the same supervisors oversaw nurses from both companies and,

---

1. According to the Appellants, Alternative did maintain a separate office until late 1999. Appellants' Opening Br. at 12.

perhaps most significantly, A–One and Alternative shared one scheduler for the employees of both companies. In 1998 or 1999—the defendants are inconsistent as to the date [2]—Black and Korman entered into mediation due to problems surrounding the sale of Alternative and amended the sale agreement that they had previously reached. Under this amendment, Korman continued to manage the care of only one Alternative patient while Black and A–One assumed responsibility for all other services rendered by Alternative. Black was initially paid a monthly management fee by Alternative, but, as Alternative became less and less profitable, it was agreed that no fee would be paid. Instead, Alternative's losses and profits were simply left in the corporation to be assumed by Black when the sale was finalized. Korman has remained the owner and president of Alternative, but her duties have been primarily limited to representing the company in situations requiring her participation as legal owner. She has had no role in the day-to-day functioning of Alternative and, as of late 2001, knew very little about the status of the company. In essence, the arrangement between Black and Korman provides that Korman will no longer have any financial interest in Alternative.

The transfer of patients and employees between the two companies also went beyond what was necessary for Alternative's Medicare certification. Not only were "Medicare-like" patients transferred from A–One to Alternative, but some patients were transferred from Alternative to A–One as well. The findings of the Department of Labor also support the picture of a relatively fluid movement of employees between the two companies, even after Alternative received its Medicare certification in February 1999. Indeed, most of the overtime wages sought accrued, according to the Department of Labor, after that date.

There was, however, always some degree of separation between A–One and Alternative. There was no formal arrangement between A–One and Alternative to share employees. All employees completed applications for employment and signed employment agreements with both companies. All employees received separate paychecks from the two companies.[3] In many cases, the hourly wage varied between the two companies. Employees were always given the choice to decline an assignment from either company.

In April 1999, the Department of Labor launched an investigation of A–One. Karen Murphy, an investigator with the Wage and Hour Division, conducted an audit of both A–One and Alternative records and determined that eight employees were not

2. Korman, in her deposition, stated repeatedly that the mediation occurred in early 1998, and that date appears to be substantiated in Yarbrough's declaration and Black's deposition (which, taken in 2001, refers to the mediation as having taken place "about three years ago"). At another point in Korman's deposition, however, she purports to correct her testimony by indicating that the testimony should refer to 1999 instead of 1998, and Black's declaration refers to the mediation as occurring in 1999. The defendants have not attempted to claim that the apparent ambiguity as to the date of the mediation substantially affects the outcome. Given that numerous other undisputed facts support the closely coordinated operation of A–One and Alternative for the entire period relevant to this lawsuit, it is immaterial to the result whether the mediation occurred in 1998 or 1999.

3. This is one of the few facts surrounding the operation of the two companies that was directly in dispute among the parties. One former employee stated in her declaration that she generally received paychecks from only one company. For the purposes of our decision, we resolve this dispute in favor of the Appellants.

paid overtime wages, in violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 207(a)(1). A–One, as it turns out, was not new to overtime wage violations. In 1991 and in 1994, the Wage and Hour Division had found A–One owing back wages of $9,873 to 46 employees and $8,055 to 45 employees, respectively. Black had signed a settlement agreement in 1994 paying $1200 in civil penalties and agreeing to comply with the FLSA in the future.

The investigation led to this suit against A–One, Alternative, Black and Korman, in which the Secretary of Labor alleged a willful violation of the overtime and recordkeeping requirements of the FLSA. The government sought unpaid overtime wages, an equal amount in liquidated damages on behalf of eight employees and a permanent injunction to stop the defendants from committing future violations of the Act. In November 2001, the district court granted the government's summary judgment motion, denying only the injunction.

■ We review a grant of summary judgment *de novo*. *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1111 (9th Cir. 2001). Viewing the evidence in the light most favorable to the non-moving party, we determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000) (en banc). In this case, the Appellants dispute five different district court holdings. First, the Appellants argue that Alternative was simply not subject to the FLSA. Second, the Appellants argue that it was legally improper to aggregate the employees' work for A–One with their work for Alternative in determining overtime. Third, a finding of willfulness here invoked a three-year statute of limitations under 29 U.S.C. § 255(a). The Appellants argue that any

violation was not willful, making appropriate a two-year statute of limitations. Fourth, the Appellants argue that they had a good faith defense, making liquidated damages inappropriate under 29 U.S.C. § 260. Finally, the Appellants argue that any claim two of the employees had is barred by res judicata, since those two employees had earlier pursued, and lost, claims in state small claims court. We review each of these decisions in turn.

### A. Coverage by the FLSA

■ In order to be covered by the FLSA's overtime rules, employees must be "engaged in commerce or in the production of goods for commerce, or ... employed in an enterprise engaged in commerce." 29 U.S.C. § 207(a)(1). In other words, coverage exists if either the employee is engaged in commerce (individual coverage), 29 U.S.C. § 203(b) (defining "commerce" as "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof"), or the employer is an enterprise engaged in commerce (enterprise coverage), 29 U.S.C. § 203(s) (defining "enterprise engaged in commerce" as enterprises that, *inter alia*, have annual gross revenue of $500,000 or greater). *See Zorich v. Long Beach Fire Dep't & Ambulance Serv., Inc.*, 118 F.3d 682, 686 (9th Cir.1997) (interpreting identical language in 29 U.S.C. § 206). The Appellants concede that A–One meets the criteria for enterprise coverage and so is subject to 29 U.S.C. § 207. However, Alternative, which meets the other criteria for enterprise coverage, had annual revenue under $500,000. *See* 29 U.S.C. § 203(s)(1)(A)(ii) (requiring that an "enterprise engaged in commerce" have annual revenue of at least $500,000).

Nonetheless, if A–One and Alternative constitute for purposes of the FLSA a

single "enterprise," it is irrelevant whether Alternative alone satisfied the revenue requirement. Instead, the proper inquiry would be whether the single enterprise comprised of A–One and Alternative satisfied the requirement. " 'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose." 29 U.S.C. § 203(r)(1). If these three elements—related activities, unified operation or common control and common business purpose—are present, different organizational units are grouped together for the purpose of determining FLSA coverage. *Id.; Brennan v. Arnheim & Neely, Inc.,* 410 U.S. 512, 518, 93 S.Ct. 1138, 35 L.Ed.2d 463 (1973). Despite the Appellants' argument to the contrary, there is no material factual dispute as to any of these elements, and the district court's conclusion that A–One and Alternative constituted a single enterprise for the purpose of coverage under § 207 was correct. We consider the three elements in order.

■ The activities of two companies are "related" if they are "the same or similar." *Arnheim & Neely,* 410 U.S. at 518, 93 S.Ct. 1138 (quoting S.Rep. No. 145, at 41 (1961)). The district court held that the fact that both A–One and Alternative provide home health services "is more than sufficient to establish that the two companies' activities are 'related.' " District Ct. Order at 6 (citing *Brennan v. Plaza Shoe Store, Inc.,* 522 F.2d 843, 848 (8th Cir. 1975), which held that a shoe store and a dress store engaged in related activities because they both sold "articles of wearing apparel . . . to the general public entering the premises which housed both stores"). The Appellants in their reply brief assert that A–One only provided "private duty home health services" while Alternative and A–One's sister corporation, A–One

Home Health, provided Medicare services. Even if, however, we accept the Appellants' assertion that A–One and Alternative were servicing different types of patients, under different levels of care and eligibility requirements, the fact that they were both providing home health services is sufficient for our conclusion that the two companies were clearly engaged in "related activities." *See also Brock v. Hamad,* 867 F.2d 804, 806 (4th Cir.1989) (holding that management of single family homes and management of an apartment building were related activities under the FLSA).

■ " 'Common' control . . . exists where the performance of the described activities [is] controlled by one person or by a number of persons, corporations, or other organizational units acting together." 29 C.F.R. § 779.221. " '[C]ontrol' . . . includes the power to direct, restrict, regulate, govern, or administer the performance of the activities." *Id.* The district court held that A–One and Alternative were under common control because both were controlled by Black. The Appellants argue that "although Ms. Black did oversee the clinical operations of Alternative, the owner of Alternative, Hanahn Korman, had the ultimate authority over financial operations of the company." Appellants' Br. at 13–14. The Appellants' argument relies on a definition of "control" based on formal corporate structure rather than practical operation. "We must look beyond formalistic corporate separation to the actual or pragmatic operation and control, whether unified or, instead, separate as to each unit." *Donovan v. Grim Hotel Co.,* 747 F.2d 966, 970 (5th Cir.1984). Despite Korman's formal corporate authority, there is no doubt here, from the deposition testimony of Black and Korman, that Black had effectively undisputed control over Alternative's operations. Indeed, by the time of Black's deposition, she had

assumed all financial responsibility for, and claimed the benefits and burdens of, the profits and losses of Alternative. A–One and Alternative were clearly under common control.[4]

■ "Common business purpose" is perhaps the most opaque part of the three-part test. The district court held that "[i]t is clear that Black managed the two companies for a common business purpose: to service home health patients, who were clients of either company, utilizing the same pool of nurses, the same scheduler, and the same phone service." We agree with the Eighth Circuit that a common business purpose is generally found where there are related activities and common control. *See Plaza Shoe Store,* 522 F.2d at 848 (citing with approval a Wage-Hour Administrator's opinion that courts have considered the satisfaction of the first two elements to suggest the satisfaction of the third, and collecting cases). With undisputed evidence that the activities of A–One and Alternative were related and that A–One and Alternative were under common control, there is no reason to doubt that A–One and Alternative shared a common business purpose.

Because A–One and Alternative performed related activities under common control for a common business purpose, the district court properly identified A–One and Alternative as a single enterprise for purposes of the FLSA's jurisdictional requirement. Since A–One by itself meets the revenue requirement for FLSA enterprise coverage, the single enterprise comprised of A–One and Alternative also satisfies the requirement. Accordingly, both A–One and Alternative are subject to § 207.

## B. Joint Employers

An employer becomes responsible for overtime once its employees exceed forty hours in one workweek. 29 U.S.C. § 207(a)(2)(C). If an individual is working for more than one company at a time, it is necessary to determine whether the individual's employers should be treated separately or jointly for purposes of determining the employers' responsibilities under the FLSA.

If all the relevant facts establish that two or more employers are acting entirely independently of each other and are completely disassociated with respect to the employment of a particular employee, who during the same workweek performs work for more than one employer, each employer may disregard all work performed by the employee for the other employer (or employers) in determining his own responsibilities under the [FLSA]. On the other hand, if the facts establish that the employee is employed jointly by two or more employers, i.e., that employment by one

---

4. The Appellants argue that the business arrangement between A–One and Alternative falls within the ambit of arrangements that 29 U.S.C. § 203(r)(1) specifically lists as not indicating common control:

> [A] retail or service establishment which is under independent ownership shall not be deemed to be so operated or controlled as to be other than a separate and distinct enterprise by reason of any arrangement, which includes, but is not necessarily limited to, an agreement, (A) that it will sell, or sell only, certain goods specified by a par-

ticular manufacturer, distributor, or advertiser, or (B) that it will join with other such establishments in the same industry for the purpose of collective purchasing, or (C) that it will have the exclusive right to sell the goods or use the brand name of a manufacturer, distributor, or advertiser within a specified area, or by reason of the fact that it occupies premises leased to it by a person who also leases premises to other retail or service establishments.

The facts here clearly do not fall within the exceptions outlined in § 203(r)(1).

employer is not completely disassociated from employment by the other employer(s), all of the employee's work for all of the joint employers during the workweek is considered as one employment for purposes of the Act. In this event, all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including the overtime provisions, with respect to the entire employment for the particular workweek.

29 C.F.R. § 791.2(a) (footnotes omitted). *See, e.g., Karr v. Strong Detective Agency, Inc.,* 787 F.2d 1205, 1208 (7th Cir.1986) (aggregating hours from joint employers for the purpose of determining overtime); *Wirtz v. Hebert,* 368 F.2d 139, 141–42 (5th Cir.1966) (same); *cf. Moon v. Kwon,* 248 F.Supp.2d 201, 236–38 (S.D.N.Y.2002) (applying § 791.2(a) to find joint and several liability for overtime wages from joint employers). "[T]he concept of joint employment should be defined expansively under the FLSA." *Torres–Lopez v. May,* 111 F.3d 633, 639 (9th Cir.1997).

■ Whether two companies constitute a single enterprise for FLSA coverage and whether they are liable as joint employers under § 207 are technically separate issues. *See, e.g., Patel v. Wargo,* 803 F.2d 632, 637 (11th Cir.1986) ("[T]he enterprise analysis is different from the analysis of who is liable under the FLSA. The finding of an enterprise is relevant only to the issue of coverage."). Nonetheless, the district court held that, "for the same factual considerations that led the court to conclude that A–One and Alternative Rehabilitation constituted one enterprise, ... the two companies were 'joint employers.'" While we believe that the district court's analysis was correct, this issue, being the core substantive question, merits more discussion.

■ The Appellants cite and discuss the eight-factor "economic reality" test for determining joint employment status in certain contexts, *see, e.g., Torres–Lopez,* 111 F.3d at 640, while at the same time recognizing that that test may be inapplicable. We agree with the Appellants that that test is inapplicable here because it applies only to circumstances in which a company has contracted for workers who are directly employed by an intermediary company. Indeed, our case law contains more examples of such "vertical" joint employment than examples of "horizontal" joint employment of the type in question here. *See, e.g., Torres–Lopez; Real v. Driscoll Strawberry Assocs., Inc.,* 603 F.2d 748 (9th Cir.1979). Thus, in place of our eight-factor test, the relevant regulations primarily guide our determination of joint employment status here.

"A determination of whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act depends upon all the facts in the particular case." 29 C.F.R. § 791.2(a).

Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:

(1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; *or*

(2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; *or*

(3) *Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of*

*the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.*

29 C.F.R. § 791.2(b) (footnotes omitted and emphases added). Subsection 791.2(b)(3) tells us that joint employment will generally be considered to exist when 1) the employers are not "completely disassociated" with respect to the employment of the individuals and 2) where one employer is controlled by another or the employers are under common control.

Black oversaw the work being done for Alternative's clients. Black, through A–One, managed Alternative's employees and the same nursing supervisors and the same scheduler were in charge of the employees while working for either company. A–One and Alternative were not completely disassociated with respect to the employment of the individuals at issue. As both the district court and we have noted, the evidence clearly indicates that A–One and Alternative were operated under the common control of Black. There is no dispute as to any of these facts, and these facts fully support the legal conclusion that A–One and Alternative were joint employers that must aggregate, for purposes of FLSA compliance, the work done by their employees for both companies.

## C. Willfulness

A violation of the FLSA is willful if the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988); *SEIU, Local 02 v. County of San Diego,* 60 F.3d 1346, 1356 (9th Cir.

1994) (quoting *Richland Shoe*). Because the district court found the Appellants' violations of the FLSA willful, the Appellants were held liable for overtime violations in the preceding three years rather than just the preceding two years. 29 U.S.C. § 255(a) (providing a three-year statute of limitations for willful violations of the FLSA).

The district court here supported its finding of knowledge or reckless disregard with testimony from former employees of the Appellants. According to *former employee Becky Lockard, when she complained of being denied overtime pay, Black told her that she "was technically working for two different companies," and that she would have "to work over 40 hours a week at each company to receive pay at the overtime rate." Kathleen Yarbrough, another nurse working for the two companies, was told that she should "think of all the blessings [she was] getting" and that Black "would go broke if she had to pay the nurses who worked on the state-pay cases for their overtime."[5] Donna Iverson, former scheduler for both companies, reported that she spoke to Black several times about the potential overtime issue and was told that "because [A–One and Alternative were] two separate companies[,] the nurses would not receive overtime pay until they worked over forty hours for each company." According to Iverson, Black told her that if the overtime wages "ever became a problem[, Black] would file for bankruptcy."

We are wary of giving full credence to this evidence, not least of all because some of these former employees are the very employees whose interests are at stake in this litigation. Nonetheless, we agree with

**5.** Apparently, the margin on state-paid cases was smaller than the margin on privately paid cases.

the district court that the Appellants did not sufficiently controvert this evidence to create a genuine issue of fact. Had the Appellants in their filings before the district court effectively presented evidence that cast doubt on whether these statements were made, it would have been proper for the district court, in viewing all the evidence in the light most favorable to the Appellants, to have disregarded the former employees' statements. Here, however, the Appellants never denied that Black made the alleged statements. Instead, the Appellants in their pleadings in opposition to summary judgment merely relied on the argument that the "unsubstantiated" "statements of the disgruntled employees . . . fail to support the Secretary's right to a judgment as a matter of law." [6] We disagree and find that the uncontroverted statements, even viewed in the light most favorable to the Appellants, support a finding of willfulness.

Despite the fact that the Appellants did not directly contest the former employees' testimony, we need not rely solely on that testimony in affirming the district court's finding of willfulness. Unlike the district court, we find probative A–One's former FLSA violations, even if they were different in kind from the instant one and not found to be willful. The fact that A–One

previously had run-ins with the Labor Department certainly put A–One and Black on notice of other potential FLSA requirements. While mere knowledge that the FLSA "was in the picture" may not be enough to sustain a finding of willfulness, *Richland Shoe*, 486 U.S. at 132–35, 108 S.Ct. 1677, A–One's prior FLSA violations, especially when combined with the undisputed testimony of the former employees, prove, at the very least, reckless disregard on the part of Black and A–One for the illegality of treating A–One and Alternative separately for the purpose of determining overtime pay. *See Alvarez v. IBP, Inc.*, 339 F.3d 894, 2003 WL 21788995 (9th Cir. Aug. 5, 2003), 2003 U.S.App. LEXIS 15622, at *36 (noting that willfulness exists "where an employer disregarded the very possibility that it was violating the [FLSA]" (internal quotation marks omitted)). Neither Black's efforts at maintaining a superficial separation between the two companies nor the formally separate legal existence of the two entities creates any material doubt as to Black's reckless disregard.[7] The district court applied the correct statute of limitations.

## D. Liquidated Damages

■ An employer who violates the overtime law is liable not only for the

---

**6.** The Appellants have since expressly conceded that Black did make the statement reported by Yarbrough.

**7.** One of the Appellants' arguments is that Black's efforts at maintaining separation between the two companies (e.g., separate paychecks, employment forms, etc.) tend to prove that her FLSA violations were not willful, i.e., that her efforts were aimed at FLSA compliance. Were the crucial question of joint employment a closer one, we might accord more credit to such efforts. For example, two employers may share employees but make serious efforts to "completely disassociate" themselves with respect to the employment of the shared individuals. Under such different circumstances, the efforts at separateness might,

at the very least, make willfulness a question more appropriate for a jury than for disposition on summary judgment. In this case, however, we do not believe that there is any genuine issue of fact about Black's willfulness. Black's efforts at keeping A–One and Alternative separate, even viewed in the light most favorable to her, appear to have been steps made to evade the FLSA, not to comply with it. *See Alvarez*, 339 F.3d 894, 2003 WL 21788995, 2003 U.S.App. LEXIS 15622, at *37 ("IBP was on notice of its FLSA requirements, yet took no affirmative action to assure compliance with them. To the contrary, IBP's actions may more properly be characterized as attempts to evade compliance. . . .").

unpaid overtime compensation but also "in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). "These liquidated damages represent compensation, and not a penalty. Double damages are the norm, single damages the exception." *Local 246 Util. Workers Union v. S. Cal. Edison Co.*, 83 F.3d 292, 297 (9th Cir.1996) (citations and internal quotation marks omitted). Courts have the discretion to deny an award of liquidated damages if the employer shows that it acted in subjective "good faith" and had objectively "reasonable grounds" for believing that its conduct did not violate the FLSA. 29 U.S.C. § 260. Although we generally review a district court's decision on liquidated damages for abuse of discretion, *Local 246 Util. Workers Union*, 83 F.3d at 298, we review the issue here, which was decided below on summary judgment, *de novo*.

 The Appellants argue that the district court erred in awarding liquidated damages because genuine issues of material fact existed concerning the Appellants' good faith defense. Of course, a finding of good faith is plainly inconsistent with a finding of willfulness. *See Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1130 (9th Cir.2002) (noting the contrapositive, that a finding of good faith precludes a finding of willfulness). Even if we were to ignore our finding of willfulness, there are not sufficient facts to support a finding of good faith on the part of the Appellants. If, for example, the Appellants had secured some objective authority, or at the very least sought advice, on the legality of treating A–One and Alternative as separate employers for the purpose of calculating overtime, we would have a different case. *See, e.g., Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 841 (6th Cir.2002) ("Nor has [the defendant] suggested that it was relying on the expertise or opinion of any other person or entity with knowledge of the FLSA regulations, including its attorney or the Department of Labor."); *Samson v. Apollo Res., Inc.*, 242 F.3d 629, 641 (5th Cir.2001) (approving a finding of good faith where the employer consulted with the Department of Labor). Black's reckless belief that formal separation of the two entities would justify nonpayment of overtime wages is legally insufficient as a good faith defense.

### E. Res Judicata

In 2000, several employees of A–One and Alternative left their employment with those corporations and accepted positions with competitors. A–One believed that its former employees were soliciting its patients, and so brought a lawsuit in Snohomish County Small Claims Court to enforce non-compete agreements that it had with the former employees. Two of the former employees then filed unsuccessful counter-claims against A–One. Ila Millard sued for breach of her employment agreement, harassment and unpaid overtime. Kathleen Yarbrough made a claim for unpaid vacation pay and Medicare taxes, but also explained to the small claims court judge that she was due overtime wages. *See* Black Decl. at 5–6, Record at 49 Ex. A ("The Court dismissed both counterclaims for overtime pay which were based on a collapse of A–One and Alternative after proof of the separate corporate status of A–One and Alternative was presented."); Yarbrough Dep. at 23–24 ("And as far as the overtime pay … I talked … about how we worked for both companies … and that I should deserve overtime pay…."), Record at 49 Ex. I; Millard Dep. at 14 (confirming that she made a claim for unpaid overtime), Record at 49 Ex. K; Record at 49 Exs. B, C, D, & E (court documents). The Appellants argue that these state court judgments preclude

the Secretary from recovering overtime wages on behalf of these two employees.

■ "Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). A federal court must give to a state court judgment the same preclusive effect as would the courts of the state in which it was rendered. *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). "Res judicata occurs when a prior judgment has a concurrence of identity in four respects with a subsequent action. There must be identity of (1) subject matter; (2) cause of action; (3) persons and parties; and (4) the quality of the persons for or against whom the claim is made." *Rains v. State,* 100 Wash.2d 660, 674 P.2d 165, 168 (1983). *Cf. Sidhu v. Flecto Co., Inc.,* 279 F.3d 896, 900 (9th Cir.2002) ("To trigger the doctrine of res judicata, the earlier suit must have (1) involved the same 'claim' or cause of action as the later suit, (2) reached a final judgment on the merits, and (3) involved identical parties or privies.").

The district court gave three reasons why res judicata did not bar the Secretary's claims against the Appellants: (1) "the record does not show that there was 'an identity of claims,' as it is unclear what the legal and factual basis was for the counterclaim"; (2) "[i]t is similarly unclear whether there was a 'final judgment on the merits'"; and (3) "[t]he defendants have proffered no authority suggesting that a counterclaim arising out of a private contract suit bars the Secretary from seeking, pursuant to the FLSA, recovery for undercompensated employees," i.e., no privity. Because res judicata is a defense, we view all facts in the light most favorable to the plaintiff.

■ The first substantial question is whether the small claims causes of action and the Secretary's cause of action have a concurrence of identity. While identity of causes of action cannot be determined precisely by mechanistic application of a simple test, we consider four factors: (1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts. *Rains,* 674 P.2d at 168 (quoting *Costantini v. Trans World Airlines,* 681 F.2d 1199, 1201–02 (9th Cir. 1982)).

It is clear enough from the evidence presented that the employees' state court claims and the Secretary's suit arose out of the same transactional nucleus of facts, the employees' work with A–One and Alternative. It is not clear exactly what evidence was presented in the state counterclaims, but we do not believe that this uncertainty, which could well have been the result of dubious conduct of the litigation by the employees, is significant in light of the certainty that the suits arose from the same transactional nucleus of facts and that both employees made at least some arguments with respect to overtime. These two factors suggest a concurrence of identity of claims.

■ The remaining two factors apply to Yarbrough and Millard differently. Perhaps the most difficult factor here is whether the state court suits involved infringement of the same right as the instant suit. With regard to Millard, although we know she pursued an overtime claim, we do not know definitively under what stat-

ute or theory she was proceeding. This uncertainty, however, does not obscure the fact that Millard admittedly pursued a claim for unpaid overtime wages. Even if Millard did not raise the FLSA argument being raised here, she could and should have. *See Lenzi v. Redland Ins. Co.*, 140 Wash.2d 267, 996 P.2d 603, 609 (2000) ("Unlike issue preclusion [collateral estoppel], which applies only to issues actually litigated, claim preclusion applies to what might, or should, have been litigated as well as to what was actually litigated."); *see also Allen*, 449 U.S. at 94, 101 S.Ct. 411. Also, the Appellants, rightly or wrongly, won in the small claims court the "right" not to pay the overtime wages to Millard. In light of all these factors, we find that Millard's state counterclaims involved the same claims as the instant suit brought by the Secretary.

Yarbrough's situation is different. Even if Yarbrough discussed unpaid overtime wages in the state court proceeding, all of the evidence other than Black's declaration shows that Yarbrough did not actually pursue a claim for overtime wages. Her counterclaim only involved vacation pay and Medicare taxes. Even if the vacation pay and overtime wage claims arose from the same transactional nucleus of facts, her joint employment by A–One and Alternative, we do not believe there to be a sufficient concurrence of identity of the causes of action to preclude the Secretary's suit with respect to Yarbrough. We therefore approve the district court's decision not to apply res judicata to the Yarbrough claims.

■ We next need to determine whether, with respect to Millard, the defendants have met the other prerequisites for res judicata. The district court had found uncertainty as to whether there was a final judgment in the earlier proceeding and whether the Secretary is in privity with

Millard in bringing an FLSA suit. We do not believe that there is material doubt about whether there were final judgments on the earlier claims. While there is a lack of detail which makes it impossible to determine exactly how the small claims court decided the claims before it, it is clear enough that Millard's claims were rejected in Snohomish County. That element is satisfied.

■ Another difficult issue here is identity of parties, or privity. We have previously held that a suit by the Secretary of Labor does not preclude a suit brought by the employees on whose behalf the secretary sued. *See Bechtel Petroleum Inc., v. Webster*, 636 F.Supp. 486 (N.D.Cal.1984), *aff'd and adopted*, 796 F.2d 252, 253 (9th Cir.1986). In *Bechtel*, first the employees filed a state action. While the state case was on appeal, the Secretary instituted a federal action, which ended with the Secretary and the employer's entering into a consent decree favorable to the Secretary and the employees. After the consent decree, the employees continued to press their state law claims. *Bechtel* on this set of facts found that the state action was not precluded because § 261(c) did not expressly terminate actions filed by employees prior to the Secretary's filing. *Bechtel*, 636 F.Supp. at 499 ("[The FLSA does] not expressly allow the Secretary to terminate *prior filed* federal actions, or state actions." (emphasis added)). The Washington Supreme Court has held that a consent decree between the EEOC and an employer does not bar an employee from pursuing a subsequent claim against the employer. *Loveridge v. Fred Meyer, Inc.*, 125 Wash.2d 759, 887 P.2d 898 (1995).

We find several key distinctions between *Bechtel* and *Loveridge* and the present case. Unlike in *Bechtel* and *Loveridge*, the employees here have already *pursued their*

claims—their suits came before the Secretary's. If *Bechtel* and *Loveridge* were at all grounded on the concern that the Secretary would co-opt claims that most directly belonged to the employees, that concern is not present here. Nor are we dealing with here as we did in *Bechtel* a question of whether a prior filed action is barred. The unusual order of filings, appeals and consent decrees found in that case is not present here.

We acknowledge that *Bechtel* contains language on the differing motives of employees and the Secretary of Labor for bringing FLSA suits. *Bechtel,* 636 F.Supp. at 500; *see also Loveridge,* 887 P.2d at 901–02 (recognizing the differing motives of employees and the EEOC). And, perhaps under some circumstances, such differences, combined with the interest that employees have in preserving their rights, may dictate that an employee has a claim against an employer even though the Secretary has already pursued a claim. In the instant case, however, there appears to be no divergence of interests between the Secretary and Millard. *See id.* at 902 (recognizing that the EEOC and employees may sometimes be in privity). The Secretary is suing for employee-specific rights of precisely the sort Millard already pursued; the "requisite closeness of interests" for privity is present. In *Loveridge,* the employee expressly disagreed with and excluded herself from the agreement reached between the employer and the EEOC. *Id.* In *Bechtel,* the employees sought relief under state law that the Secretary could not obtain under federal law. Here, we have no such discrepancies or distinctions. Indeed, if Millard had succeeded in her counterclaim and been awarded overtime wages, the Secretary would not sue for those wages already paid to her. The fact that Millard lost her claim should not change the result. In this context, the Secretary seeks only to recoup Millard's individual economic loss, not to vindicate broader governmental interests by, for example, seeking an injunction. Thus, there is privity, and we are satisfied that the defendants have met all the requirements for a determination of res judicata.

 Nor does the nature of the earlier proceedings, small claims counterclaims, somehow bar preclusion. Washington courts look to four factors in determining whether a prior proceeding should have preclusive effect: the character of the court, the scope of the court's jurisdiction, procedural informality and procedural safeguards. *See State Farm Mut. Auto. Ins. Co. v. Avery,* 114 Wash.App. 299, 57 P.3d 300, 304–06 (2002) (rejecting preclusion because Washington small claims proceeding involving less than $250 in controversy cannot be appealed). *State Farm,* which is controlling here, held that the only reason there was no preclusive effect in that case was because there was no right to appeal. According to *State Farm,* Washington small claims court cases in which there is a right to appeal meet all four factors. *But cf. Sanderson v. Niemann,* 17 Cal.2d 563, 110 P.2d 1025, 1030–31 (1941) (refusing collateral estoppel, or issue preclusion, effect to California small claims judgments, in part due to the informality of the proceedings). Millard's small claims counterclaim was for more than $2000, and so she had the right to appeal. Thus, the nature of the proceedings gives no cause to deny res judicata effect. We therefore reverse the contrary decision of the district court, and the Secretary's claims as to Millard (but not as to Yarbrough) are barred.

AFFIRMED IN PART AND REVERSED IN PART.