NATIONAL RESOURCES DEFENSE COUNCIL, et al. Plaintiffs,

and

State of New York, et al. Intervenor–Plaintiffs,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al. Defendants,

and

Associated General Contractors of America, et al. Intervenor–Defendants.

No. CV 04–8307–GHK(RCX).

United States District Court, C.D. California.

June 27, 2006.

---

Clare F. Saperstein, Kim J. Landsman, Patterson Belknap Webb and Tyler, New York, NY, Daniel G. Cooper, Lawyers For Clean Water, San Francisco, CA, Jason M. Booth, Dongell Lawrence Finney, Los Angeles, CA, Layne K. Friedrich, Lawyers for Clean Water, Santa Monica, CA, David T. Ballard, Barnes and Thornburg, Chicago, IL, Jeffrey S. Longsworth, Barnes and Thornburg, Washington, DC, for Plaintiffs.

Denise Lillio Vecchio, Stephen G. Vitelli, State of Connecticut Attorney General's Office, Hartford, CT, Jan Chatten–Brown, Katherine A. Trisolini, Chatten–Brown & Associates, Santa Monica, CA, Andrew G. Frank, New York State Office of the Attorney General, New York, NY, Philip Bein, New York State Attorney General's Office, Albany, NY, for Intervenor–Plaintiffs.

Alan D. Greenberg, United States Department of Justice, Denver, CO, for Defendant.

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

KING, District Judge.

This matter is before the Court on a motion for partial summary judgment brought by Plaintiffs Natural Resources Defense Council ("NRDC") and Waterkeeper Alliance (collectively "Environmental Plaintiffs") and Intervenor Plaintiffs State of New York, New York State Department of Environmental Conservation, and State of Connecticut (collectively

"States" or "State Plaintiffs") against Defendants United States Environmental Protection Agency and Stephen L. Johnson (collectively "EPA") and Intervenor Defendants National Association of Home Builders and Associated General Contractors of America (collectively "Intervenor Defendants"). We heard oral argument on this matter, and ordered further briefing in light of such hearing. After carefully considering all the papers filed and the parties' arguments in court, we rule as follows.

The parties are familiar with the facts in the current action. Thus, we will not repeat any facts except as necessary.

## I.

### Introduction

The issue before us is the scope of the EPA's obligations under the Clean Water Act ("the Act"), specifically 33 U.S.C. §§ 1314(b), 1314(m), and 1316. In 1987, Congress amended the Act by adding section 1314(m), which provides that every two years the EPA shall publish a plan identifying "categories of sources discharging toxic or nonconventional pollutants" for which effluent limitation guidelines ("ELGs") and new source performance standards ("NSPSs") have not yet been published. 33 U.S.C. § 1314(m)(1)(B). The plan must also "establish a schedule for promulgation of effluent guidelines" for the categories identified in the plan, "under which promulgation of such guidelines shall be no later than ... 3 years" from publication of the plan. 33 U.S.C. § 1314(m)(1)(C).[1]

In 2002, in accordance with 33 U.S.C. § 1314(m), the EPA proposed effluent limitation guidelines and new source performance standards for storm water discharges from the construction and development industry ("the Construction Industry"). However, after receiving public comment on the proposed regulations, the EPA decided not to issue the proposed ELGs and NSPSs. Instead of establishing uniform national standards for these sources of discharge, which would be applied through the issuance of permits, the EPA elected to allow the National Pollutant Discharge Elimination System ("NPDES") authorities in various states to continue issuing permits based on their "best professional judgment," exercised on a case-by-case basis. *See* Effluent Limitations Guidelines and New Source Performance Standards for the Construction and Development Category, 69 Fed.Reg. 22,472 (April 26, 2004) (to be codified at 40 C.F.R. pt. 450).

Plaintiffs sue to compel the EPA to promulgate ELGs and NSPSs for the Construction Industry. In moving for partial summary judgment on their first claim, Plaintiffs seek a declaratory judgment that the EPA, by declining to promulgate ELGs and NSPSs for the Construction Industry, has failed to comply with the requirements of 33 U.S.C. §§ 1314(b), 1314(m), and 1316. Plaintiffs argue that the Act imposes on the EPA a nondiscretionary duty to promulgate ELGs and NSPSs for categories of sources identified in a plan published pursuant to section 1314(m). Defendants respond that the Act imposes no such duty. Additionally, they argue that Plaintiffs' motion should be de-

---

1. The statute provides that the first section 1314(m) plan shall be published "[w]ithin 12 months after February 4, 1987," and "promulgation of such guidelines for categories identified in the first published plan shall be no later than 4 years after February 4, 1987." 33 U.S.C. § 1314(m)(1)(C). In fact, final pub-

lication of the first section 1314(m) plan did not take place until January 2, 1990. As the Construction Industry did not appear on the first plan, the relevant deadline for promulgation in this case is the three-year deadline that applies to discharge sources listed on subsequent plans.

nied because (1) Plaintiffs lack standing to bring this claim and (2) the first claim is barred by claim preclusion. We first address these two threshold issues.

## II.

### Standing

■ The standing inquiry serves to determine whether "a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy," *Sierra Club v. Morton,* 405 U.S. 727, 731, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and to ensure that legal questions will be resolved "in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). To ascertain whether the "case or controversy" requirement under Article III (U.S. Const. art. III, § 2, ¶ 1) is satisfied, we must consider three issues.

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... the result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations omitted).

■ In addition to the Article III standing requirements, we also adhere to self-imposed prudential principles that limit the exercise of federal jurisdiction. *See Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). These include "the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Id.* Unlike constitutional standing requirements, these prudential requirements can be modified or abrogated by Congress in its legislative enactments. *See Bennett v. Spear,* 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). In the case before us, the Clean Water Act's citizen suit provision authorizes civil actions by "any citizen ... on his own behalf" "where there is alleged a failure of the [EPA] Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." 33 U.S.C. § 1365(a) and (a)(2). This provision is regarded as extending standing to the "outer boundaries" set by Article III, eliminating the need for a separate prudential standing inquiry. *Ecological Rights Found. v. Pac. Lumber Co.,* 230 F.3d 1141, 1147 (9th Cir.2000).

■ The party invoking federal jurisdiction has the burden of establishing the various elements of standing. As "an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130. Because the relief sought by the State Plaintiffs and the Environmental Plaintiffs is the same, a conclusion that one group of plaintiffs has standing is sufficient to overcome Defendants' challenge. *See Dept. of Commerce v. United States House of Representatives,* 525 U.S. 316, 330, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999) (presence of one party with standing assures court a case is justiciable); *Bowsher v. Synar,* 478 U.S. 714, 721, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (declining to consider standing of challenged groups of plaintiffs where it

was clear one group of plaintiffs possessed standing).

## A. Environmental Plaintiffs

■ "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.(TOC), Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). The EPA does not challenge the Environmental Plaintiffs' standing. The Intervenor Defendants do not contest that the Environmental Plaintiffs satisfy the second and third prongs of the organizational standing requirements, but contend that individual members of the Environmental Groups cannot establish standing, which requires a showing of injury in fact, causation, and redressability, as set forth in *Lujan.*

■ In environmental cases, the injury in fact requirement is met if an individual member adequately shows that she or he has an economic, aesthetic, or recreational interest in a particular place, animal, or plant species and that the interest is impaired by the challenged conduct. *See Laidlaw Envtl. Servs.*, 528 U.S. at 183–84, 120 S.Ct. 693; *Lujan*, 504 U.S. at 562–63, 112 S.Ct. 2130. Individual members must "distinguish themselves from the public at large" by demonstrating that the injury alleged will affect them " 'in a personal and individual way.' " *Harris v. Bd. of Supervisors*, 366 F.3d 754, 761 (9th Cir.2004) (*quoting Lujan*, 504 U.S. at 560 n. 1, 112 S.Ct. 2130). "An individual can establish 'injury in fact' by 'showing a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable—that he or she really has [suffered] or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded.' " *Ocean Advocates v. U.S. Army Corps. of Eng'rs*, 402 F.3d 846, 859–60 (9th Cir.2005) (*quoting Ecological Rights Found.*, 230 F.3d at 1149); *see also Laidlaw*, 528 U.S. at 181–83, 120 S.Ct. 693 (holding that injury in fact was sufficiently established by evidence that plaintiffs avoided a river because of concerns about defendants' discharges); *NRDC v. Sw. Marine, Inc.* 236 F.3d 985, 994 (9th Cir. 2000) (holding that injury in fact was established by plaintiffs' testimony that their use of a bay had been curtailed by concerns about pollution and contaminated fish). An increased risk of harm is sufficient to establish injury in fact for standing purposes. *See Ocean Advocates*, 402 F.3d at 860; *Harris*, 366 F.3d at 761.

The Environmental Plaintiffs have submitted declarations documenting members' use of waterways for aesthetic and recreational purposes. *See, e.g.*, Declaration of NRDC member Richard Horner, dated June 9, 2005 ("Horner Decl.") ¶ 5; Declaration of NRDC member Christopher May, dated April 25, 2005 ("May Decl.") ¶ 6; Declaration of Waterkeeper Alliance member Don McEnhill, dated June 9, 2005 ("McEnhill Decl.") ¶ 6; Declaration of Waterkeeper Alliance member Michael Mullen, dated June 13, 2005 ("Mullen Decl.") ¶¶ 6. Members testify that they have used, studied, and enjoyed their local waterways for years, demonstrating that their uses are actual and concrete, not merely hypothetical. Their statements demonstrate "tangible, continuing" connections to specific locations affected by the Agency decision they contest. *See Ecological Rights Found.*, 230 F.3d at 1148 (observing that plaintiffs who "failed to show any tangible, continuing connection to any particular location affected by the challenged decision" have been found to lack

standing); McEnhill Decl. ¶¶ 6, 7, 15; Declaration of NRDC member Betty Rushton, dated June 6, 2005 ("Rushton Decl.") ¶¶ 5, 6, 7. They have also testified, based on personal experience and first-hand observation, that sedimentation, increased turbidity, and pollution resulting from the stormwater discharges of construction and development sites have decreased their use of and pleasure in waterways. *See, e.g.,* Horner Decl. ¶ 7; May Decl. ¶¶ 6–8; McEnhill Decl. ¶¶ 5, 15, 17, 24, 49; Mullen Decl. ¶¶ 8, 11, 12, 14, 17, 38; Rushton Decl. ¶¶ 3, 6, 7.[2] This evidence adequately establishes that the Environmental Plaintiffs have suffered the factual injury required to confer standing.

 The Intervenor Defendants contend that the Environmental Plaintiffs cannot trace the injuries they cite to the EPA's decision not to promulgate national ELGs and NSPSs for the Construction Industry, and therefore they fail to satisfy the causation requirement for standing. We conclude, however, that causation is sufficiently established by the congressional findings that prompted passage of the Clean Water Act. While Congress may not create standing on its own, "it can provide legislative assessments which courts can credit in making standing determinations." *Nat'l Wildlife Fed'n v. Hodel,* 839 F.2d 694, 708 (D.C.Cir.1988), *rev'd on other grounds sub nom Nat'l Wildlife Fed'n v. Lujan,* 928 F.2d 453 (D.C.Cir.1991). Thus, we look to congressional findings when confronted, as we are here, with complex questions of causation which have already been addressed in legislative enactments. *See Autolog Corp. v. Regan,* 731 F.2d 25, 31 (D.C.Cir.1984) ("we must give great weight to this congressional finding [of causation] in our standing inquiry"); *Animal Welfare Inst. v. Kreps,* 561 F.2d 1002, 1010 (D.C.Cir.1977) (causation is shown because the Marine Mammal Protection Act "established as a matter of law the requisite causal relationship between American importing practices and South African sealing practices").

We regard congressional determinations as especially pertinent here because the Clean Water Act "not only regulates actual water pollution, but embodies a range of prophylactic, procedural rules designed to reduce the risk of pollution." *Ecological Rights Found.,* 230 F.3d at 1152. As environmental harm incorporates an increased threat of harm, and therefore "is by nature probabilistic," *Friends of the Earth Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 160 (4th Cir.2000), causation cannot be fixed with absolute certainty. *See id.* at 163–64 (to have standing turn on complex questions of scientific traceability and direct evidence of causation in Clean Water Act cases would constitute "escalated standing requirements").

The legislative history of the Clean Water Act establishes that Congress determined that uniform, technology-based effluent limitations, to be developed in response to effluent limitation guidelines, are necessary to reduce and ultimately eliminate pollutants from the nation's waters.[3] Senate Consideration of the Con-

---

**2.** The Intervenor Defendants object to McEnhill Decl. ¶¶ 17, 49, and Mullen Decl. ¶ 38 as containing improper opinion testimony and/or conclusions of law. Defs.' Memo. in Supp. of Mot. to Dismiss, at A–40 n. 22. We rely on these passages only to the extent that they state the declarants' decreased enjoyment of waters affected by discharges from construction sites.

**3.** Effluent limitations, mandated by 33 U.S.C. § 1311, are defined as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources" into the waters of the United States. 33 U.S.C. § 1362(11). Effluent limitation guidelines serve as the technical foundation on which effluent limitations are based. *See*

ference Report, Oct. 4, 1972, *reprinted in* 1 Environmental Policy Division of the Congressional Reference Service, *A Legislative History of the Water Pollution Control Act Amendments of 1972* (hereinafter *1972 Legislative History* ), 162 (1973) (citing uniformity of regulations as necessary to make the proposed law an improvement over the status quo); S.Rep. No. 99–50, at 3 (1985) (citing lack of technology-based standards as contributing to inefficacy of previous approach to water pollution). Without such uniform, technology-based limitations, the ongoing pollution of waterbodies will continue. Under the statute, effluent limitations for sources discharging toxic and nonconventional pollutants must require application of the "best available technology economically achievable." *See* 33 U.S.C. § 1311(b)(2)(A). The absence of guidelines identifying the best available control practices and specifying the degree of effluent reduction achievable with their use heightens the risk of a continued degradation of waters used by the individual members of the Environmental Plaintiffs. A cognizable harm to these Plaintiffs is thus traceable to the EPA's decision not to promulgate ELGs and NSPSs for the Construction Industry. One "does not have to await the consummation of the threatened injury to obtain preventive relief." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (*quoting Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S.Ct. 658, 67 L.Ed. 1117 (1923)) (threat of injury is sufficient to confer standing to challenge constitutionality of statute).

The Intervenor Defendants nevertheless argue that Environmental Plaintiffs do not "trace any alleged injuries to the narrowly defined sources (construction sites one acre or greater) subject to the Guidelines Decision." Defs.' Memo. in Supp. of Mot. to Dismiss, at A–44:12–14. However, the Clean Water Act was specifically designed to render unnecessary difficult causation analyses of this sort. By mandating the regulation of polluting discharges at "point sources" through technology-based standards, Congress aimed to overcome problems of scientific traceability that had hampered enforcement of the prior, water-quality-based approach. *See* S.Rep. No. 99–50, at 3; *Gaston Copper Recycling Corp.*, 204 F.3d at 163. As the Supreme Court has explained, by relying on direct discharge restrictions, the Clean Water Act made it "unnecessary to work backward from an overpolluted body of water to determine which point sources are responsible and which must be abated." *EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 204, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). Instead, "a discharger's performance is now measured against strict technology-based effluent limitations—specified levels of treatment— to which it must conform." *Id.* at 204–05, 96 S.Ct. 2022. We decline to require Plaintiffs to demonstrate causation with a degree of certainty that Congress has determined is not realistically achievable. By including the Construction Industry in

*E.I. duPont de Nemours & Co. v. Train*, 430 U.S. 112, 116–17, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977). NPDES permits, whether issued by the EPA or state programs, transform these generally applicable limitations into the specific obligations of individual dischargers. *Id.* at 119–20, 97 S.Ct. 965 (*quoting EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976)). The Clean Water Act contemplates that guidelines and limitations will be developed as two steps in this process. In practice, the EPA has consolidated these steps by issuing a single regulation, known as an effluent limitation guideline, that includes both the section 1314(b) guidelines and the section 1311 effluent limitations. *See du Pont*, 430 U.S. at 124, 97 S.Ct. 965; Defs.' Supplemental Brief in Supp. of Mot. to Dismiss, at A–3:23–A–4:2.

a section 1314(m) plan, the EPA identified it as a source of toxic and/or nonconventional pollutants, and the Intervenor Defendants have made no showing to the contrary here. Because Congress determined that uniform ELGs and NSPSs are the most effective means of reducing the risks associated with toxic and nonconventional discharges, and the Environmental Plaintiffs seek promulgation of such standards for an industry that currently lacks them, they have established that the risk of continued degradation to the waterbodies they enjoy is traceable to the EPA's inaction.

■■■ In addition to challenging the traceability of the Environmental Plaintiffs' injuries to the EPA's decision, the Intervenor Defendants contend that Plaintiffs cannot prove that promulgation of national guidelines will actually redress Plaintiffs' injuries by altering stormwater discharges from construction sites, tightening requirements of state permits in the areas in which they reside, or improving the quality of the waterways they frequent. However, like causation, redressability is established by reference to the Congressional determinations underlying the Clean Water Act. See Alaska Ctr. for the Env't v. Browner, 20 F.3d 981, 984–985 (9th Cir.1994) (relief sought is not speculative when Congress has already determined that it is the appropriate means of achieving desired water quality standards when other methods have failed); Int'l Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795, 811–12 (D.C.Cir.1983) (rejecting defendant's argument that reimposition of regulations rescinded by Secretary of Labor would not redress plaintiffs' injury because the argument "directly contravenes the congressional judgment underlying" the Fair Labor Standards Act). Drafters of the Clean Water Act stressed "[u]niformity, finality, and enforceability" as the "three essential elements" of the proposed legislation. Senate Consider-

ation of the Conference Report, Oct. 4, 1972, reprinted in 1 1972 Legislative History, supra, at 162. The relief requested here—promulgation of national ELGs and NSPSs—is designed to achieve these goals, deemed by Congress to be critical to reducing pollution. National guidelines were mandated in order to provide uniformity. See Senate Debate on S. 2770, Nov. 2, 1971, reprinted in 2 1972 Legislative History, supra, at 1405. Technology-based standards were mandated to improve enforceability. See EPA v. California ex rel. State Water Resources Control Board, 426 U.S. at 204–05, 96 S.Ct. 2022. To conclude that it is merely speculative that the promulgation of uniform discharge limitations would reduce the risk of pollution from construction sites would be to substitute the Court's assessment of appropriate environmental policy for that of Congress.

Even without the congressional findings, however, we conclude that the declarations of organization members with expert knowledge of the impact of stormwater discharges sufficiently establish a causal connection between their injuries and the EPA's failure to promulgate ELGs and NSPSs, as well as the probability of redress of their injuries by the relief they seek. For example, Michael Mullen is the Director of the Center for Environmental Research and Service at Troy University and a Certified Professional in Erosion and Sediment Control. Mullen Decl. ¶¶ 3, 5. He led an Alabama Erosion and Sediment Control Task Force that developed recommendations for reducing water quality problems related to excessive erosion and sediment transport. Mullen Decl. ¶ 5. Mr. Mullen testifies that he has observed excessive sediment deposits and increased turbidity in waterbodies due to the Construction Industry's failure to adopt effective preventative methods. Mullen Decl. ¶¶ 12, 17. He points out that Alabama

Construction Permits do not specify Best Management Practices, allowing some sites to employ inappropriate methods in attempting to prevent pollution. Mullen Decl. ¶ 22.

Christopher May, a freshwater ecologist and senior research scientist at the Battelle Marine Sciences Laboratory in Sequim, Washington, has observed that the stream systems where aggressive stormwater management techniques are used are healthier than the stream systems where they are not. *See* May Decl. ¶¶ 3–5, 7, 9, 16, 17. Richard Horner is a researcher and consultant to federal, state and local government agencies on storm water runoff and surface water management. Horner Decl. ¶¶ 3, 4, 8–10. He reports monitoring the successful use of stormwater management technologies in preventing the release of high levels of phosphorous into Lake Sammamish, Washington. Horner Decl. ¶ 19. However, Horner states, in his experience some areas show extensive use of such technologies, while other areas show very little. Horner Decl. ¶ 20.

 Plaintiffs cannot realistically establish more than that a lack of national guidelines and standards has increased the *risk* of polluted waterbodies and that promulgation of such regulations is *likely* to reduce pollution because the precise content of the regulations that will be promulgated is as yet undetermined. In this sense, a suit requesting that an agency be required to promulgate statutorily mandated regulations is analogous to a suit claiming a procedural injury. Under *Lujan*, Plaintiffs have standing to enforce a procedural right "so long as the procedures in question are designed to protect some threatened concrete interest of [theirs] that is the ultimate basis of [their] standing." *Lujan*, 504 U.S. at 573 n. 8, 112 S.Ct. 2130. *See also Defenders of Wildlife v. Flowers*, 420 F.3d 946, 957 (9th Cir.2005)

("To establish standing by alleging procedural harm, the members must show only that they have a procedural right that, if exercised, *could* protect their concrete interests and that those interests fall within the zone of interests protected by the statute at issue." (emphasis in original)); *Douglas County v. Babbitt*, 48 F.3d 1495, 1501 (9th Cir.1995) (same). Just as a plaintiff cannot establish with certainty that a statutorily mandated consultation or environmental impact statement will ultimately protect its concrete interests (*see Lujan*, 504 U.S. at 572 n. 7, 112 S.Ct. 2130), Plaintiffs here cannot establish with certainty that guidelines and standards will reduce pollution in the waterbodies they enjoy when the content of the regulations is still unknown. To require plaintiffs alleging that the EPA has failed to perform a non-discretionary duty to promulgate guidelines to make a more detailed showing of causation and redressability than Plaintiffs have produced here would mean that *no* plaintiff would have standing to bring such a suit, as one cannot demonstrate the efficacy of regulations that have yet to be issued. Such a requirement would significantly undermine the citizen suit provision Congress included in the Clean Water Act. *See* 33 U.S.C. § 1365(a)(2) (authorizing citizen suits against the EPA Administrator for failure to perform a non-discretionary duty).

As the Environmental Plaintiffs have shown cognizable injuries in fact, and the causation and redressability requirements are met both by congressional findings and their own declarations, we conclude that the Environmental Plaintiffs have standing to bring their first claim.

### B. State Plaintiffs

 Each of the State Plaintiffs, New York and Connecticut, operates a NPDES permit program for pollutant discharges

within its borders pursuant to 33 U.S.C. § 1342(b). These permit programs must incorporate technology-based requirements limiting polluting discharges, based either on ELGs and NSPSs promulgated by the EPA or on their own "best professional judgment," exercised on a case-by-case basis. *See* 33 U.S.C. §§ 1342(a)(1)(A) and (B), (b)(1)(A); *NRDC v. Costle,* 568 F.2d 1369, 1378–79 (D.C.Cir.1977) (describing relationship between NPDES permits and effluent limitations and guidelines); 40 C.F.R. § 125.3. However, when waterbodies are documented as impaired, states must adopt additional requirements, called total maximum daily loads ("TMDLs") to achieve water quality standards. 33 U.S.C. § 1313(d).[4]

To satisfy the injury in fact requirement, the State Plaintiffs assert three related injuries resulting from the EPA's failure to promulgate effluent limitation guidelines and new source performance standards for the Construction Industry. In support of these claims, they have submitted declarations from Angus K. Eaton, Chief of the General Permits Section of the Bureau of Water Permits, Division of Water for the New York State Department of Environmental Conservation, and Patricia Primi, an Environment Scientist in the Environmental Protection Bureau of the New York State Office of the Attorney General. *See* Declaration of Angus K. Eaton, dated June 16, 2005 ("Eaton Decl."); Declaration of Patricia Primi, dated June 16, 2005 ("Primi Decl."). Defendants have not filed any objections to these declarations, nor have they submitted any countervailing evidentiary declarations of their own.

First, the States contend that, in the absence of national standards for construction site discharges, they have suffered increased pollution of their waters from upstream, out-of-state construction and development sites. Eaton Decl. ¶¶ 16–18; Primi Decl. ¶¶ 11–34. Second, the increased pollution has forced the States to take on the expense of developing TMDLs for waterbodies, such as the Long Island Sound and Lake Champlain, polluted by out-of-state sources. Eaton Decl. ¶¶ 11, 13, 15, 17, 18, 19. Yet the efficacy of these measures is threatened by the effect of runoff from less adequately regulated upstream sources. Primi Decl. ¶ 20, 29. Finally, the States claim that the continuing absence of national ELGs and NSPSs for the Construction Industry requires them to devote their own resources to developing and refining technology-based permit requirements. Eaton Decl. ¶ 13, 14. Thus the State Plaintiffs have alleged both environmental and economic harms. The declarations they have submitted proffer specific facts demonstrating these injuries. Defendants acknowledge that waters within New York and Connecticut fail to meet current water quality standards, partly due to the presence of excessive sediment (*see* Defs.' Memo. in Supp. of Mot. to Dismiss, at A–34:25–27), and they do not dispute that pollutants enter these waters from construction sites in other states. Defendants also concede that, in the absence of national ELGs and NSPSs for the Construction Industry, the State Plaintiffs are burdened with developing their own permit requirements. *See* Defs.' Memo. in Supp. of Mot. to Dismiss, at A–34:17–19.

---

**4.** States must submit to the EPA for approval a list of the waterbodies identified as impaired and the TMDLs established for each. *See* 33 U.S.C. § 1313(d)(2). If approved, the TMDLs are then incorporated into a state's continuing planning process. *See* 33 U.S.C. §§ 1313(d)(2), 1313(e). If the EPA does not approve the state's submission, the EPA Administrator must identify impaired waterbodies and TMDLs for each, which the state must then incorporate into its plan. *See* 33 U.S.C. § 1313(d)(2).

We conclude that the State Plaintiffs have shown sufficient cognizable injuries to their proprietary interests to establish standing. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex. rel. Barez,* 458 U.S. 592, 601–02, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982) (explaining proprietary interests). A state's interest in protecting its natural resources and environment from harm constitutes a proprietary interest. *See City of Sausalito v. O'Neill,* 386 F.3d 1186, 1198–99 (9th Cir.2004) (harm to natural resources constitutes injury to a city's proprietary interests). In environmental cases, moreover, "an increased risk of harm can itself be injury in fact sufficient for standing." *Ecological Rights Found.,* 230 F.3d at 1151. As the States have identified pollution of their waterways from upstream sources, a harm which also entails significant monetary costs to the States, they have established sufficient injuries to proprietary interests to establish standing.

Defendants argue that the injuries asserted by the State Plaintiffs are not caused by the EPA's failure to promulgate ELGs and NSPSs for the Construction Industry. First, Defendants contend that the States' expenditures for the development of technology-based standards of their own are traceable to the States' independent decisions to operate permit programs. However, while it may be true that the State Plaintiffs incurred the expense of initially developing discharge standards for the Construction Industry by electing to operate permit programs before all national effluent limitation guidelines are promulgated, the States had reason to anticipate eventual reliance on national standards. Section 1342, which addresses NPDES programs, states that permits are to meet either all requirements established by sections 1311 and 1316, or *"prior* to the taking of necessary implementing actions relating to all such requirements, such conditions as the Ad-

ministrator determines are necessary to carry out the provisions of [the Act.]" 33 U.S.C. § 1342(a)(1) (emphasis added). Section 1314, in turn, states that ELGs are to be published "[f]or the purpose of adopting" the effluent limitations described in section 1311. *See* 33 U.S.C. § 1314(b). Thus, the structure of the Act confirms that Congress intended NPDES permits to be governed by national effluent limitations and new source performance standards based on ELGs promulgated pursuant to section 1314. *See also* 33 U.S.C. § 1342(b)(1)(A) (state NPDES permits must apply requirements established under sections 1311 and 1316).

While the EPA's slow pace in developing ELGs and NSPSs meant that permits were in fact issued for years without national standards, this does not mean that the States were not harmed by the EPA's decision not to promulgate ELGs and NSPSs for the Construction Industry once such standards and guidelines were developed. The EPA's decision to forgo national guidelines and standards, not the States' initial action in setting up NPDES programs, burdens the States with the ongoing expense of refining their own standards in response to changing conditions and information. *See* Eaton Decl. ¶ 13 (discussing New York's $55,900 contract with Center for Watershed Protection to further refine standards and/or provide guidance in implementation). Finally, even if the States' independent actions contributed to the financial burden of which they now complain, "[i]t is well settled that a plaintiff has standing to challenge conduct that indirectly results in injury, as long as the injury is fairly traceable to the challenged conduct." *Autolog Corp.,* 731 F.2d at 31 (*citing United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 688, 93 S.Ct.

2405, 37 L.Ed.2d 254 (1973)). Injury may be caused by Agency actions making it more "difficult and onerous" for states to comply with water quality standards. *See West Virginia v. EPA*, 362 F.3d 861, 868 (D.C.Cir.2004).

Defendants also maintain that the States have not satisfied the causation requirement because they fail to establish a link between the impaired quality of their waterbodies and inadequate technology-based limits in permits governing discharges from construction sites in upstream states. In regard to the alleged degradation of the State Plaintiffs' waterbodies by pollutants from upstream sources, we conclude that the causation requirement is satisfied, as with the Environmental Plaintiffs, by the legislative findings which prompted passage of the Clean Water Act. Congress specifically designed the Act to address the problems inherent in differing state discharge limitations. By providing for uniform, national regulations, Congress attempted to prevent the transfer of pollution "from one area to another" as industries seek out less restrictive regulatory environments, reducing states' incentives to adopt stringent requirements. *See* Senate Debate on S. 2770, Nov. 2, 1971, *reprinted in* 2 *1972 Legislative History, supra*, at 1405. Consequently, a program allowing recognition of "locational differences" was rejected. *Id.* Senator Muskie explained: "[T]he Administrator is expected to be precise in his guidelines so as to assure that similar point sources with similar characteristics, regardless of their location or the nature of the water into which the discharge is made, will meet similar effluent limitations." Senate Consider-

ation of the Conference Report, Oct. 4, 1972, *reprinted in* 1 *1972 Legislative History, supra*, at 172.

Even without the support of legislative findings, the State Plaintiffs have submitted facts sufficient to establish that their injuries are "fairly traceable" to the EPA's inaction. *See Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. Plaintiffs have proffered uncontroverted evidence showing that discharges from construction and development sites in upstream states are polluting their waterbodies and that upstream states have differing discharge standards. *See* Eaton Decl. ¶ 16; Primi Decl. ¶¶ 18, 19, 23, 24.

Defendants also contend that the State Plaintiffs cannot establish redressability as to the environmental injury because some of the pollution from upstream sources is attributable to inadequate enforcement and lack of compliance with existing limitations.[5] However, Plaintiffs are not required to "negate every conceivable impediment to effective relief." *See Int'l Ladies' Garment Workers' Union*, 722 F.2d at 811. Although third party behavior will necessarily affect the efficacy of any ELGs or NSPSs promulgated by the EPA, lack of compliance with lawful regulations is not the kind of third party behavior that the Court has found to render redressability overly speculative. *See id.* (distinguishing between circumstances in which independent third party action is necessary to achieve redress and "extraordinary" measures, such as violating the law, that third parties might potentially take that would obstruct redress); *see also Alaska Ctr. for the Env't*, 20 F.3d at 985

---

**5.** Defendants assert that the State Plaintiffs themselves allege inadequate enforcement of and lack of compliance with existing regulations, rather than shortcomings in the standards themselves. Plaintiffs dispute this characterization of their argument and evidence. Our reading of the Plaintiffs' com-

plaint and the declarations submitted by the State Plaintiffs confirms that they attribute the harm to New York and Connecticut waters to ineffective restrictions in existing permits, not to lack of compliance with or enforcement of those restrictions.

(argument that redressability requirement is unsatisfied because relief is contingent on act of a third party is untenable when Congress has determined that requested relief is an effective means of achieving desired water quality). Nor does the existence of alternative means of redressing the States' alleged injuries undercut Plaintiffs' claim that the relief sought will afford redress, as Defendants maintain. Congress, presumably, was aware of these statutory alternatives as well.

Finally, Plaintiffs' injury of increased administrative costs and burdens will be redressed by the promulgation of ELGs and NSPSs, as Defendants themselves concede. *See* Eaton Decl. ¶ 14; Defs' Mem. in Supp. of Mot. to Dismiss at A–34:17–19.

As the States have established injuries in fact, and the requirements of causation and redressability are satisfied by Congressional findings and the States' uncontroverted declarations, we conclude that the State Plaintiffs have standing to bring the first claim.

## III.

### Claim Preclusion

 Defendants argue that NRDC's prior suit against the EPA regarding effluent limitation guidelines (*NRDC v. Reilly*, No. 89–2980, 1991 WL 501928, 1991 U.S. Dist. LEXIS 5334 (D.D.C. April 23, 1991)) and the resulting consent decree preclude NRDC from litigating its nondiscretionary duty claim here. Under the doctrine of claim preclusion, "[a] final judgment on the merits of an action precludes the parties or their privies [6] from

relitigating issues that were or could have been raised in that action." *Federated Dep't. Stores v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981).

 The central dispute is whether this case involves the same "cause of action" as did *Reilly*. When a defendant asserts claim preclusion, we employ four criteria to ascertain whether the two suits involve the same cause of action: "(1) whether the two suits arise out of the same transactional nucleus of facts; (2) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (3) whether the two suits involve infringement of the same right; and (4) whether substantially the same evidence is presented in the two actions." *Mpoyo v. Litton Electro–Optical Sys.*, 430 F.3d 985, 987 (9th Cir.2005) (*citing Chao v. A–One Med. Servs., Inc.*, 346 F.3d 908, 921 (9th Cir. 2003)). These factors are not to be applied "mechanically." *Id.* Courts have often regarded the first factor as the most significant. *See, e.g., Costantini v. Trans World Airlines*, 681 F.2d 1199, 1202 (9th Cir. 1982).

### A. Transactional Nucleus of Facts

 Two suits arise from the same transaction or series of transactions when they are "related to the same set of facts" and "could conveniently be tried together." *Mpoyo*, 430 F.3d at 987(*quoting W. Sys., Inc. v. Ulloa*, 958 F.2d 864, 871 (9th Cir. 1992)). When considering whether an earlier suit involved the same "nucleus of facts" for preclusion purposes, we must construe the scope of the earlier action

---

**6.** Defendants have not specified whether the Intervenor Defendants also assert claim preclusion or, if so, whether it is asserted against Plaintiffs other than NRDC. Nor have they claimed that the other parties are privies of either the EPA or NRDC. Because claim preclusion applies only when the parties in both

suits are identical or privies, it appears that, even if we agreed with Defendants' claim preclusion argument, only NRDC, and not the other Plaintiffs, would be barred from bringing the action. However, in light of our resolution of the claim preclusion issue, we need not resolve this matter.

narrowly. *See Orff v. United States,* 358 F.3d 1137, 1144 (9th Cir.2004), *aff'd,* 545 U.S. 596, 125 S.Ct. 2606, 162 L.Ed.2d 544 (2005) (*quoting Cent. Delta Water Agency v. United States,* 306 F.3d 938, 953 (9th Cir.2002)). In *Reilly,* NRDC argued that the EPA's first section 1314(m) plan, issued on January 2, 1990, failed to identify all industries discharging toxic and nonconventional pollutants that were not yet subject to ELGs, did not establish schedules for the promulgation of ELGs by the statutorily imposed deadlines, and neglected to provide for review and revision of existing ELGs. *Reilly,* 1991 U.S. Dist. LEXIS 5334, at *12. In contrast, the instant suit does not address identification of source categories, timely scheduling, or review and revision of guidelines. Rather, it challenges the EPA's failure to promulgate ELGs and NSPSs for the Construction Industry, a source category already identified in a section 1314(m) plan. This issue was not raised in the *Reilly* action.

In fact, the EPA's failure to promulgate ELGs and NSPSs for source categories identified in a section 1314(m) plan could not have been raised in *Reilly* for several reasons. At the time of the *Reilly* action, the Construction Industry had not yet been identified as a source category. *See* 65 Fed.Reg. 53,008 (Aug. 31, 2000) (identifying construction and development industry as category for which effluent guidelines were under development). Even if it had been so identified, NRDC could not have challenged any failure by the EPA to promulgate ELGs and NSPSs in *Reilly* because, under section 1314(m)(1)(C), promulgation of guidelines for categories identified in the first published plan was required to be "no later than 4 years after February 4, 1987." (For subsequent plans, promulgation must take place within three years.) 33 U.S.C. § 1314(m)(1)(C). The complaint in *Reilly* was filed on October 30, 1989, less than four years after February 4, 1987. Therefore, the issue

raised by Plaintiffs here would not have been ripe for consideration in the earlier suit.

■ Moreover, the facts upon which the Plaintiffs predicate their claim—the EPA's identification of the Construction Industry as a source of toxic and nonconventional pollutants and its subsequent decision not to promulgate ELGs and NSPSs for that industry—were not in existence at the time *Reilly* was filed and litigated. Claim preclusion does not bar litigants from bringing claims based on conduct that occurred after the settlement of a prior suit. *See Lawlor v. Nat'l Screen Serv. Corp.,* 349 U.S. 322, 328, 75 S.Ct. 865, 99 L.Ed. 1122 (1955) (a judgment does not extinguish claims that did not exist at the time of the judgment and could not possibly have been sued upon in the previous case); *Frank v. United Airlines, Inc.,* 216 F.3d 845, 851 (9th Cir.2000) (a second Title VII action brought by plaintiffs against United Airlines was not barred because it was based on alleged violations occurring after settlement of an earlier action); *Apotex, Inc. v. FDA,* 393 F.3d 210, 218 (D.C.Cir.2004) ("*Res judicata* does not bar parties from bringing claims based on material facts that were not in existence when they brought the original suit."). As this case arises from events that had not yet transpired at the time *Reilly* was settled, we conclude the two suits do not involve the same transactional nucleus of facts.

**B. Impairment of Rights Previously Established**

Defendants also argue that allowing NRDC to proceed with the instant suit would impair rights established by the consent decree in *Reilly.* Specifically, they claim that under the terms of the consent decree, the EPA was obligated, among other things, to identify eight point source categories for effluent guidelines rulemak-

ing, and then to "start action," propose new or revised guidelines for each category, and "take final action" on the proposals by specified deadlines. *See* Consent Decree in *NRDC v. Reilly,* Civil No. 89–2980(RCL) (D.D.C.1991) (hereinafter "Consent Decree"), ¶ 5. Defendants maintain that the EPA took "final action" on its proposed ELGs and NSPSs for the Construction Industry in its April 26, 2004, decision not to promulgate them. *See* Effluent Limitations Guidelines and New Source Performance Standards for the Construction and Development Category, 69 Fed.Reg. 22,472 (April 26, 2004) (to be codified at 40 C.F.R. pt. 450). In doing so, Defendants contend, the EPA discharged its obligations under section 1314(m)(1)(C) as determined by the consent decree. Therefore, they maintain, to grant NRDC the relief it seeks in the current matter would be to vitiate the earlier agreement and the rights it established.

We disagree. The introduction to the consent decree expressly reserved, as to both parties, the right to make "any claim ... on any grounds, related to any final agency action taken pursuant to this Decree." Consent Decree, at p. 3 ("Express Reservation of Rights"). Defendants would have us read into this provision the terms of a narrower reservation of rights found elsewhere in the consent decree. In paragraph 6, the agreement acknowledges that "[t]he parties disagree with respect to what discretion, if any, EPA has under applicable law to decide not to proceed with an effluent guideline." *Id.* at ¶ 6. Thus the consent decree reserved to NRDC the right to contest any decision "not to proceed with an effluent guideline." *Id.* at ¶ 6(a)(2). For this purpose, "decide not to proceed with an effluent guideline" is defined in paragraph 6 as "to make a final, affirmative decision *prior to proposal* that an effluent guideline is not appropriate for the point source under consideration." *Id.* at ¶ 6 (emphasis add-

ed). Relying on this paragraph, Defendants maintain that NRDC reserved its right to challenge EPA action pursuant to the decree *only* when the Agency decides *prior to proposal* not to promulgate guidelines for a given category of sources. Because ELGs and NSPSs for the Construction Industry were proposed in 2002, the current challenge does not fit within these parameters.

We find that the EPA's contentions are at odds with the expansive language of the Express Reservation of Rights ("*any* claim ... on *any* ground, related to *any* final agency action") that introduces the consent decree and precedes the more specific provisions of paragraph 6. The EPA's interpretation would render the prefatory reservation of rights superfluous, by confining its scope to the issues addressed more particularly in the sixth paragraph. *See* Consent Decree, ¶ 6. In light of the consent decree's introductory provision, we conclude that it reserved to NRDC the right to challenge the EPA's decision not to promulgate ELGs and NSPSs for source categories identified in a section 1314(m) plan. Accordingly, the current action does not impair any rights established by settlement of the previous suit.

**C. Infringement of Same Right**

As to the third prong on the claim preclusion inquiry, we find that while both the *Reilly* case and the instant suit allege that the EPA has violated its statutory obligations under 33 U.S.C. § 1314(m), the rights at issue in the two cases are distinct. Here, Plaintiffs allege a violation of the EPA's obligation to promulgate ELGs and NSPSs for the Construction Industry, while in *Reilly* Plaintiffs alleged the EPA had violated its obligations to identify all industries discharging toxic and nonconventional pollutants that were not yet subject to ELGs and NSPSs, to

schedule promulgation of ELGs for the identified categories by the statutorily imposed deadline, and to provide for review and revision of existing guidelines.

## D. Similarity of Evidence

Finally, the evidence offered in the two actions varies to some degree. Both cases turn primarily on statutory interpretation, but to the extent that evidence is presented in the instant suit, much of it has come into existence since the consent decree in *Reilly*. *See* Exhibits to Joint Brief Concerning Defs.' Mot. to Dismiss and Pls.' Mot. for Partial Summ. J., Exs. A–W.

A practical, non-mechanical application of the relevant factors militates in favor of finding that the two suits do not involve the same cause of action. Accordingly, we conclude that claim preclusion does not bar NRDC from bringing this action.

## IV.

## The EPA's Obligations to Promulgate Effluent Limitation Guidelines and New Source Performance Standards

The central dispute in this case is the EPA's obligations under 33 U.S.C. § 1314(m). The Plaintiffs assert that because the Construction Industry was identified as a point source in the 2000 and 2002 plans published pursuant to section 1314(m), the EPA's decision not to promulgate ELGs and NSPSs for the industry constitutes a failure to perform a nondiscretionary duty. Defendants, on the other hand, argue that the Act does not mandate promulgation of effluent guidelines and performance standards for every category of industry discharging pollutants. They maintain that the Act grants the Agency discretion to determine whether promulgation of national ELGs and NSPSs is the most effective method of controlling the discharge of pollutants by a particular category of point sources.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Here, there is no dispute that the EPA has not promulgated ELGs and NSPSs for the Construction Industry, nor as to any other material facts. Since the only issue raised is a question of statutory interpretation, it is appropriate to decide the issue on summary judgment. *Cal. Dep't of Toxic Substances Control v. Alco Pac., Inc.*, 317 F.Supp.2d 1188, 1191 (C.D.Cal.2004).

## A. Effluent Limitation Guidelines

▆▆▆ When, as here, a Plaintiff alleges that an agency has failed to comply with a nondiscretionary duty, and the agency contests the existence of such a duty, our first point of reference is the statute alleged to have imposed the duty—in this instance, the Clean Water Act. We first inquire whether Congress has directly addressed the contested issue, either in the language of the statute itself or in the act's legislative history, in which case "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *See Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We "must reject administrative constructions which are contrary to clear congressional intent." *Id.* at 843 n. 9, 104 S.Ct. 2778. If, however, congressional intent cannot be ascertained or is ambiguous, we consider whether the agency's interpretation of the statute is a reasonable one. *Id.* at 843, 104 S.Ct. 2778. We afford "great deference"

to the interpretation given a statute by its implementing agency, *City of Seattle v. FERC*, 923 F.2d 713, 715 (9th Cir.1991), and may not substitute our own construction of a statutory provision for an agency's reasonable interpretation. *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778. *See also S.F. BayKeeper v. Whitman*, 297 F.3d 877, 885 (9th Cir.2002) (engaging in *Chevron* review of EPA's interpretation of the Clean Water Act to determine if the Agency had failed to comply with a nondiscretionary duty to establish TMDLs for California when the state failed to submit TMDLs for approval); *Sierra Club v. Browner*, 130 F.Supp.2d 78, 90 (D.D.C. 2001) (*Chevron* review is appropriate when citizen brings suit claiming agency has failed to perform nondiscretionary duty).

 The specific provision at issue here is 33 U.S.C. § 1314(m). However, well-accepted rules of statutory construction instruct that provisions should be read in relation to one another and in the context of the entire statute in which they appear, with a sense of their place within the overall statutory structure. *See Davis v. Mich. Dept. of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989). When possible, courts should interpret a statute as a coherent regulatory scheme. *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568–70, 115 S.Ct. 1061, 131 L.Ed.2d 1

(1995). The plain language of section 1314(m) reveals that it must be read in connection with sections 1314(b)(2) and 1316, which it specifically names.[7]

A congressional intent to require promulgation of ELGs is clearly expressed in section 1314(b) of the Act: "For the purpose of adopting or revising effluent limitations ... the Administrator shall, after consultation with appropriate Federal and State agencies and other interested persons, publish within one year of October 18, 1972, regulations, providing guidelines for effluent limitations ...." 33 U.S.C. § 1314(b). The mandatory language here is unmistakable. The guidelines are to be developed "for the purpose of adopting"— not deciding whether or not to adopt— effluent limitations. Promulgation of guidelines is set forth as an affirmative and binding obligation. *See Alabama v. Bozeman*, 533 U.S. 146, 153, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001) ("The word 'shall' is ordinarily the language of command.") (internal quotations and citations omitted); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 34–35, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998) (characterizing use of the term "shall" as normally creating a mandatory obligation); *Pierce v. Underwood*, 487 U.S. 552, 569–70, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (referring to "shall" as "mandatory" rather

---

**7.** The entirety of section 1314(m) reads as follows:

(m) Schedule for Review of Guidelines
 (1) Publication
 Within 12 months after February 4, 1987, and biennially thereafter, the Administrator shall publish in the Federal Register a plan which shall—
 (A) establish a schedule for the annual review and revision of promulgated effluent guidelines, in accordance with subsection (b) of this section;
 (B) identify categories of sources discharging toxic or nonconventional pollutants for which guidelines under subsection (b)(2) of this section and section

1316 of this title have not previously been published; and
 (C) establish a schedule for promulgation of effluent guidelines for categories identified in subparagraph (B), under which promulgation of such guidelines shall be no later than 4 years after February 4, 1987, for categories identified in the first published plan or 3 years after the publication of the plan for categories identified in later published plans.
 (2) Public Review
 The Administrator shall provide for public review and comment on the plan prior to final publication.
33 U.S.C. § 1314(m)

than "permissive" statutory language); *Idaho Conservation League, Inc. v. Russell*, 946 F.2d 717, 720 (9th Cir.1991) (characterizing as "mandatory" the language of 33 U.S.C. § 1313(c)(4) providing that "the Administrator shall promulgate").

We do not foreclose the possibility that in some instances a statute's use of the term "shall" authorizes rather than requires the specified agency action. "The question whether 'shall' commands or merely authorizes is determined by the objectives of the statute." *Sierra Club v. Whitman*, 268 F.3d 898, 904 (9th Cir.2001). In this instance, the objectives of the Clean Water Act militate in favor of reading the language as mandatory. Indeed, this was the conclusion of the court in *NRDC v. Train*, 510 F.2d 692 (D.C.Cir. 1974). Stressing the Act's legislative history and the importance of the effluent limitation guidelines within the overall statutory scheme, the court found that the EPA Administrator had a "primary responsibility" to publish effluent limitation guidelines by October 18, 1973, for those sources listed in section 1316, and by December 31, 1974, for most other classes and categories of point sources. *Id.* at 704–11.

The EPA did not meet these initial deadlines, and it is clear that the 1987 amendments to the Act, which included section 1314(m), resulted from congressional frustration with "the slow pace in which these regulations are promulgated." *See* S.Rep. No. 99–50, at 3 (1985). Section 1314(m) requires that every two years the EPA shall publish a plan in which the Agency identifies categories of sources discharging toxic or nonconventional pollutants for which the EPA has not yet published effluent limitation guidelines under section 1314(b)(2) or new source performance standards under section 1316. *See* 33 U.S.C. §§ 1314(m)(1)(B), 1314(b)(2), 1316. The plan shall also "establish a schedule

for promulgation of effluent guidelines" for the named categories "under which promulgation of such guidelines shall be no later than … 3 years" from the publication of the plan. 33 U.S.C. § 1314(m)(1)(C). Read as integrated provisions within a single regulatory structure, section 1314(b) creates a mandatory duty to promulgate ELGs while section 1314(m) strengthens, rather than dilutes, that duty by describing particular categories of sources that must be identified in a biennial plan and providing that the Agency must schedule promulgation of (not a determination of whether to promulgate) ELGs no more than three years after the plan's publication. Congressional desire to alter the "pace in which regulations are promulgated" would not be served by an amendment that merely added further procedural requirements, but did not require actual promulgation of regulations.

Our interpretation is consistent with previous readings of these provisions. In *NRDC v. Reilly*, the court ruled that the EPA did not have the discretion to identify only select point sources discharging toxic and nonconventional pollutants in its first section 1314(m) plan. *NRDC v. Reilly*, 1991 U.S. Dist. LEXIS 5334 at *25–26. Rather, the court held, the section 1314(m)'s command to identify those sources not yet subject to guidelines requires the Agency to identify *all* such point sources discharging toxic and nonconventional pollutants. *Id.* at *16–26. We conclude that section 1314(m), read together with section 1314(b), likewise creates a mandatory duty to promulgate ELGs and NSPSs for the categories of sources named in a plan. Even if we were to accept Defendants' argument that only "date certain" deadlines create mandatory duties (a point on which we do not rule), a reading of sections 1314(b) and 1314(m) in concert compels our conclusion that section

1314 provides both a mandate to promulgate ELGs and a deadline by which such promulgation shall take place.

Section 1314(b)'s statutory mandate to promulgate ELGs is linked to section 1314(m) in the legislative history of the Act as well. A 1985 Senate Report concluded its discussion of section 1314(m) by explaining: "Guidelines are required for any category of sources discharging significant amounts of toxic pollutants. In this use, 'significant amounts' does not require the Administrator to make any determination of environmental harm; any non-trivial discharges from sources in a category *must lead to effluent guidelines*." *See* S.Rep. No. 99–50, at 25 (1985) (emphasis added). To read section 1314(m) as requiring merely a schedule for, but not actual, promulgation of ELGs runs altogether counter to this unambiguous expression of congressional intent.

An interpretation of section 1314(m) as creating a nondiscretionary duty to promulgate ELGs for identified categories of sources is also consistent with the articulated purposes of the original 1972 Act. A Senate consideration of the original Act stressed that its three "essential elements" were uniformity, finality, and enforceability. *See* Senate Consideration of the Conference Report, Oct. 4, 1972, *reprinted in* 1 *1972 Legislative History, supra,* at 162. To achieve uniformity and finality, "each polluter within a category or class of industrial sources will be required to achieve nationally uniform effluent limitations based on 'best practicable' technology" by a specified date. *Id.* The EPA's 2004 decision not to promulgate national guidelines for the Construction Industry, but to continue to rely upon the issuance of permits with varying standards, is thus at odds with the expressly stated goals of the legislation.

Defendants attempt to explain this tension by asserting that the Act establishes several different mechanisms for reducing pollution, including permits based on the best professional judgment of NPDES administrators. However, this claim is belied by the language of 33 U.S.C. § 1342(a)(1), which specifies the two conditions under which the EPA Administrator may issue NPDES permits. Such permits may be issued if they are in conformity with the standards, such as ELGs and NSPSs, established through other sections of the Act. 33 U.S.C. § 1342(a)(1)(A). Alternatively, "prior to the taking of necessary implementing actions relating to all such requirements," the Administrator may determine conditions for permitting. 33 U.S.C. 1342(a)(1)(B). That is, the issuance of permits not subject to ELGs and NSPSs was to be only an interim measure pending the promulgation of guidelines, limitations, and standards mandated elsewhere in the Act. *See also* H.R.Rep. No. 92–911, at 126 (1972), *reprinted in* 1 *1972 Legislative History, supra,* at 813 (Since it would be unreasonable to delay issuing of permits until implementation of standards is complete, the Administrator "may issue permits during this interim period with such conditions as he determines are necessary to carry out the provisions of this Act."). Once national limitations are established, state permit programs are required to apply them in order to achieve the statutory goal of uniform effluent limitations for "similar point sources with similar characteristics." Senate Consideration of the Conference Report, Oct. 4, 1972, *reprinted in* 1 *1972 Legislative History, supra,* at 172. We know of no legal authority stating that the practice of issuing permits based on "best professional judgment" was to be ongoing. *See E.I. du Pont de Nemours & Co. v. Train,* 430 U.S. 112, 120, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977) (stating that although 33 U.S.C. § 1342 "authorizes the imposition of limitations in individual permits, the section it-

self does not mandate either the Administrator or the States to use permits as the method of prescribing effluent limitations").

In support of their claim that the Act allows regulation of polluting discharges other than through promulgation of ELGs, Defendants refer to 33 U.S.C. § 1342(p), which sets forth a separate program for regulation of stormwater discharges. But as they conceded at oral argument, all construction and development sites, other than those under one acre in size, are treated by the EPA as "industrial activity," and therefore, under 33 U.S.C. §§ 1342(p)(2)(B) and (3)(A), are governed by effluent limitations. Moreover, the structure of section 1342(p), which was part of the 1987 Amendments to the Act, reveals the same congressional intent to mandate Agency action, rather than authorize Agency discretion, when it comes to promulgating regulations. The provisions of this section require that the Agency "issue regulations" designating stormwater discharges to be regulated and establish a comprehensive program for such regulation, including requirements for state stormwater management programs and "expeditious deadlines." *See* 33 U.S.C. § 1342(p)(6). This statutory scheme, mandating promulgation of national requirements and express deadlines, accords with an interpretation of section 1314(m) as imposing a mandatory duty to promulgate ELGs.

Additionally, we conclude that even were the EPA's mandatory duty to promulgate ELGs for the Construction Industry not clear from the statute and legislative history, the Agency's interpretation of section 1314(m) is not reasonable. It renders the provision's requirements potentially irrelevant because scheduled, but not promulgated, ELGs do not reduce polluting discharges—the fundamental purpose of the Clean Water Act. Defendants

contend that compelling the publication of a schedule for promulgation of ELGs without requiring promulgation itself is not useless. First, they maintain that the submission of ELGs for public review and comment before final publication pursuant to the Administrative Procedure Act (5 U.S.C. § 553(c)) is meant to generate a proceeding on the question of whether to promulgate ELGs at all. Such a proceeding would have little purpose, Defendants assert, if inclusion of a category of sources on a plan meant that the EPA was thereby compelled to issue ELGs for it, whatever intervening information might reveal. We disagree. The review and comment process serves to elicit response to the *content* of ELGs, not to the advisability of promulgating them at all. The EPA appears to recognize as much, as evidenced by the language of the consent decree into which the EPA and NRDC entered as a consequence of *NRDC v. Reilly.* The Decree states that, pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 551–59, 701–06, "EPA will fully consider and respond to public comments before making a final decision on the scope and substance of [not whether there should be] any final effluent guideline." Consent Decree, ¶ 1(d).

Defendants also maintain that the Clean Water Act specifies a number of statutory factors that must be taken into account in the development of ELGs. *See* 33 U.S.C. §§ 1311(b)(2)(A), 1314(b)(2)(A) and (B). Accordingly, they argue, the three-year period between the identification of categories and the promulgation of guidelines is intended to allow the EPA to determine whether it has the record basis for promulgation. We find this argument unpersuasive for several reasons. First, the requirement in section 1314 to specify these factors in "regulations" presupposes that ELGs must be promulgated. *See* 33 U.S.C. § 1314(b). Second, the section 1314 factors relate to relative

determinations of the "best" technologies, measures, and practices within specified contexts and parameters, or to specification of the degree of effluent reduction attainable through available practices. Identification of such factors, as statutorily required, would not in any instance preclude promulgation of limitation guidelines. Third, the section 1311 provisions cited by Defendants in support of their claim only indicate discretion insofar as section 1311(b)(2)(A) states that effluent limitations "shall require the *elimination* of discharges of all pollutants if the Administrator finds . . . that such elimination is technologically and economically achievable for a category or class of point sources as determined in accordance with regulations issued by the Administrator pursuant to section 1314(b)(2) . . ." (emphasis added). This is discretion to determine that a limitation mandating complete elimination of a pollutant is not feasible—not to decide not to issue an ELG at all. Fourth, Defendant's argument regarding the constraints imposed by 1314(b)'s statutory factors runs counter to the holding in *NRDC v. Train,* in which the court held that promulgation of ELGs was mandatory for the categories of sources enumerated in section 1316. *See Train,* 510 F.2d at 704. The section 1314(b) statutory factors apply no less to the ELGs found to be mandatory by the *Train* court than to those Plaintiffs currently seek to have promulgated.

For all of these reasons, we conclude that section 1314(m) creates a nondiscretionary duty to promulgate ELGs for those source categories identified in a section 1314(m) plan.

**B. New Source Performance Standards**

Both parties agree that subsections (B) and (C) of 33 U.S.C. § 1314(m)(1) apply to new source performance standards. Thus their disagreement on this issue is largely the same as it is with regard to ELGs. The EPA argues that it has a duty under subsection 1314(m)(1)(C) to establish a schedule for promulgation of NSPSs, but no concomitant duty to actually promulgate them. Plaintiffs argue that in requiring the EPA to establish a plan to promulgate standards for categories identified under subsection 1314(m)(1)(B), Congress also intended to require the Agency to actually promulgate them. Insofar as ELGs and NSPSs are addressed identically in section 1314(m)—they are not even distinguished—we conclude that our reasoning with respect to the EPA's duty to promulgate ELGs once they are identified in a section 1314(m) plan applies to NSPSs as well. It would, for instance, be equally irrational for Congress to mandate that the EPA create a plan to promulgate NSPSs without also requiring their actual promulgation. Nor have Defendants offered any evidence that Congressional desire to hasten the promulgation of regulations applied only to ELGs. There is no evidence that Congress was more sanguine about the EPA's promulgation of NSPSs, such that promulgation of ELGs was mandated but not promulgation of NSPSs.

The EPA argues that Plaintiffs have not brought a claim pursuant to 33 U.S.C. § 1316(b)(1)(B) of the Act, which it claims is the only source of a mandatory duty to promulgate NSPSs. Section 1316(b)(1)(B) requires the Agency to promulgate NSPSs for the categories of sources listed by Congress in section 1316(b)(1)(A), as well as categories subsequently added to the list by the EPA. However, Defendants maintain, the identification of a source category as discharging toxic or nonconventional pollutants under section 1314(m)(1)(B) does not automatically add the category to the section 1316 list. Thus there exists no mandatory duty to promulgate NSPSs for those categories identified under section 1314(m) alone. This argument assumes, however, that section 1314(m) does not

serve as a separate statutory basis for a mandatory duty to promulgate NSPSs for categories identified under section 1314(m)(1)(B).

We reject Defendants' argument. The chart attached to the EPA's response to our inquiry about the promulgation of NSPSs for source categories other than those included on the list in section 1316(b)(1)(A) reveals that of the categories that were first identified for possible NSPSs after 1987 (when section 1314(m) was enacted), none was included on a section 1316 list. *See* Def. U.S. EPA's Response to Court's Question Regarding New Source Performance Standards, Table A. By contrast, all but one were identified in a section 1314(m) list. In other words, since section 1314(m) was enacted, the EPA has promulgated NSPSs for categories included in section 1314(m) plans, but has added no new categories to the section 1316 list. Hence section 1314(m) seems currently to be the only vehicle by which the EPA identifies new source categories for the purpose of developing NSPSs. Therefore the EPA's own action demonstrates that NSPSs *can* be and have been promulgated under authority other than section 1316.

▪ Reading the Clean Water Act as a coherent statutory scheme, we conclude that section 1314(m) not only serves as statutory authority for the promulgation of NSPSs, it also creates a nondiscretionary duty to promulgate standards for those categories of sources identified in a section 1314(m) plan. As we have concluded that section 1314(m) creates a nondiscretionary duty to promulgate ELGs for source categories identified in a section 1314(m) plan, and the provision does not distinguish in any way between ELGs and NSPSs, it follows that the promulgation of NSPSs for identified categories is nondiscretionary as well. Moreover, it is a tenet of statutory construction that " 'Congress

must be presumed to have known of its former legislation ... and to have passed the new laws in view of the provisions of the legislation already enacted.' " *Owner–Operators Independent Drivers Ass'n of Am., Inc. v. Skinner,* 931 F.2d 582, 586 (9th Cir.1991) (*quoting St. Louis, I.M. & S. Ry. v. United States,* 251 U.S. 198, 207, 40 S.Ct. 120, 64 L.Ed. 225 (1920)). Given that in 1972 Congress had made promulgation of NSPSs mandatory once categories were identified in a section 1316 list, and section 1314(m) was born of impatience with the "slow pace" of promulgation, it would run counter to the spirit of section 1316, as well as the express congressional intent behind section 1314(m), to read the latter section as making promulgation of NSPSs for identified sources discharging toxic and/or nonconventional pollutants discretionary. Instead, we construe section 1314(m) as *reinforcing* section 1316 by likewise requiring promulgation for those source categories identified under its mandate.

▪ Finally, to conclude that *only* Section 1316 creates a duty to promulgate NSPSs would vitiate section 1314(m)'s reference to section 1316 and render it meaningless, as nothing is accomplished by requiring a schedule for promulgation of standards but not the promulgation itself. *See Lake Cumberland Trust, Inc. v. EPA,* 954 F.2d 1218, 1222 (6th Cir.1992), *modified with respect to unrelated claim,* 954 F.2d 1218 (6th Cir.1992) (courts are to make "every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless, or superfluous"). By contrast, to conclude that both section 1314(m) and section 1316 impose a mandatory duty to promulgate NSPSs for source categories identified pursuant to their authority is to give effect to the plain language of the statute and the expressed Congres-

sional intent behind each of the provisions. "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed. congressional intention to the contrary, to regard each as effective." *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

The EPA argues that to make promulgation of NSPSs mandatory under section 1314(m) would result in conflicting time frames for promulgation once a source category has been identified. Section 1316 provides that within a year after a category has been identified, the Agency shall propose and publish regulations establishing NSPSs for that category, affording an opportunity, for comment. The standards are to be promulgated no more than 120 days after publication. *See* 33 U.S.C. § 1316(b)(1)(B). Section 1314(m) provides that after categories are identified, the EPA shall establish a schedule for promulgation of guidelines in which promulgation will take place no more than three years after a category is identified in a published plan. *See* 33 U.S.C. § 1314(m)(1)(C). Thus two different sets of deadlines are set forth in the two provisions. However, the earlier provision, section 1316 (enacted in 1972), addresses procedures for promulgating standards for any identified new sources "from which there is or may be the discharge of pollutants." 33 U.S.C. § 1316(a)(3). The later provision, section 1314(m) (enacted in 1987), more specifically addresses "categories of sources discharging *toxic or nonconventional* pollutants for which guidelines under ... section 1316 ... have not previously been published." 33 U.S.C.

§ 1314(m)(1)(B) (emphasis added). Thus, the tension between the two time frames for promulgation is resolved according to a well-established rule of statutory construction. To the extent there is an "irreducible inconsistency" between two provisions, "the later and more specific statute usually controls the earlier and more general one." *Hellon & Assoc., Inc. v. Phoenix Resort Corp.,* 958 F.2d 295, 297 (9th Cir.1992). Consequently, for sources identified in a section 1314(m) plan, the later and more specific provision should control.

This conclusion is also supported by the context in which the later provision was enacted. In developing the 1987 Amendments to the Clean Water Act, Congress referred to "new, more subtle, problems" of pollution, including "devastating toxic substances." S.Rep. No. 99–50, at 3 (1985). By mandating that the EPA identify in a section 1314(m) plan *all* categories of all sources known to discharge toxic or nonconventional pollutants at the time of the plan's publication, section 1314(m) affords the EPA Administrator no discretion as to when identification of these source categories should take place,[8] in contrast to section 1316, which merely states that the EPA shall revise the list of source categories "from time to time." 33 U.S.C. § 1316(b)(1)(A). Congress also rectified the one-year deadline that the EPA had already demonstrated it could not meet by setting forth the three-year deadline in section 1314(m)(1)(C). Thus the existence of two different deadlines in the two provisions does not prevent us from giving each full effect.

For all of these reasons, we conclude that section 1314(m) creates a nondiscretionary duty to promulgate NSPSs for

---

**8.** *See Reilly,* 1991 U.S. Dist. LEXIS 5334 at *19–26 (holding that section 304(m)(1)(B) imposed on the EPA a nondiscretionary duty to identify all industries discharging toxic and

nonconventional pollutants in non-trivial amounts not currently subject to ELGs and NSPSs).

those source categories identified in a section 1314(m) plan.

## C. Removal of the Construction Industry From the EPA's Section 1314(m) Plans

Finally, Defendants argue that, even if there is a mandatory duty to promulgate ELGs and NSPSs for all source categories included in a section 1314(m) plan, the Agency is not obligated to promulgate guidelines or standards for the Construction Industry because, after including that industry as a point source in its 2000 and 2002 lists, it eliminated the category from its 2004 list. In its supplemental briefing, the EPA relies on *Izaak Walton League of Am. v. Johnson,* 400 F.Supp.2d 38 (D.D.C. 2005), in which the district court held it did not have jurisdiction to hear a suit alleging that the EPA had failed to fulfill a nondiscretionary duty under the Clean Air Act ("CAA") to promulgate air emission standards for electric utility steam generating units ("EUSGUs"). The EPA had removed EUSGUs from its list of sources of hazardous air pollutants after the deadline for the promulgation of standards had passed. *See id.* at 40. The court stated that "if the EPA lawfully has delisted EUSGUs from the source categories list on March 15, 2005, the EPA's nondiscre-

tionary duty to promulgate emission standards has ceased." *Id.* at 41.[9]

We reject Defendants' argument that removing a source category from a section 1314(m) list relieves it of the duty to promulgate ELGs and NSPSs for that category. We find that nothing in the Clean Water Act grants the EPA any discretion to remove source categories from a section 1314(m) plan. By contrast, the Clean Air Act includes an express provision setting forth the conditions under which a category may be delisted. *See* 42 U.S.C. § 7412(c)(9). To conclude that section 1314(m) includes an implied grant of discretion to remove source categories already included in a biennial plan would run counter to the express provision of section 1314(m)(1)(C) mandating promulgation within a specified period. If the EPA were able to remove categories from the list at will, the schedule for promulgation would potentially be meaningless, as the Agency could strategically delist categories in order to extend indefinitely the time within which to promulgate ELGs and NSPSs. Given the articulated congressional intent to prod the EPA into more speedy action through the passage of section 1314(m), we do not find it reasonable that the legislature would have silently

---

**9.** The *Izaak Walton* court made its jurisdictional ruling on the ground that, under the CAA, exclusive jurisdiction to review "final action" taken on "nationally applicable regulations" was vested in the District of Columbia Court of Appeals. *Izaak Walton League of America,* 400 F.Supp.2d at 42–44. Delisting a source category was such a final action, the court reasoned. *Id.* at 43. To the extent that Defendants offer *Izaak Walton* as a renewed challenge to this Court's authority to hear Plaintiffs' first claim, the reasoning in our August 29, 2005, order denying Defendants' motion to dismiss remains applicable. There we said: "the specificity of [33 U.S.C. § 1369(b)], in 'distinguish[ing] between EPA approvals, determinations and promulgations . . . demonstrates that Congress did not intend

court of appeals jurisdiction over all EPA actions taken pursuant to the [CWA].'" Order of August 29, 2005 (*quoting Boise Cascade Corp. v. EPA,* 942 F.2d 1427, 1431–32 (9th Cir.1991)) (*citing Longview Fibre Co. v. Rasmussen,* 980 F.2d 1307, 1313 (9th Cir.1992); *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren,* 309 F.3d 1181, 1190 n. 8 (9th Cir.2002); *Lake Cumberland Trust, Inc. v. EPA,* 954 F.2d 1218, 1222 (6th Cir.1992); *Bethlehem Steel Corp. v. EPA,* 538 F.2d 513, 517 (2d Cir.1976)). Unlike provisions under the CAA (*see* 42 U.S.C. § 7607(b)(1)), section 1369(b) does not confer on the Courts of Appeals broad jurisdiction over final EPA actions taken pursuant to the CWA.

granted the Agency discretion to frustrate its purpose.

■ Defendants seem to assume that the EPA's duties under section 1314(m) may be negated by the publication of a subsequent plan. However, the duty to promulgate—and the time frame within which it is to take place—is triggered by a category's first inclusion in a section 1314(m) plan. Otherwise, the three-year deadline for promulgation would be extended every two years when a new plan is published. Identification of the Construction Industry in the 2000 plan determines the EPA's obligation in regard to promulgation of ELGs and NSPSs for that industry—not the industry's inclusion in or omission from the 2004 plan. As we discussed above, the three years provided for promulgation of ELGs and NSPSs allow the Agency to determine the substance and scope of the guidelines and standards, not whether to promulgate them at all.

■ At root, Defendants' reasoning in regard to the delisting of source categories resembles the argument rejected by the court in *NRDC v. Reilly*, where the court found the EPA could not avoid the promulgation of guidelines "by selectively omitting industries from the agency's [section 1314(m)] plan." *Reilly*, 1991 U.S. Dist. LEXIS 5334 at *22. In *Reilly* the court noted, "[s]urely the Congress which passed [§ 1314(m)] out of frustration with the agency's sluggishness did not intend to confer upon the agency discretion to limit the scope and set the pace of effluent guidelines preparation simply by refraining from 'identifying' known polluters." *Id.* at *22–23. Nor does it seem likely that Congress qualified the EPA's duty to promulgate effluent guidelines and standards by silently granting the Agency discretion to remove a category from a section 1314(m) plan once the source has been identified as emitting toxic and/or nonconventional pollutants. There is little differ-

ence between "selectively omitting" industries from a plan in the first place and later removing them. Thus we conclude that the EPA may not evade its duty to promulgate ELGs and NSPSs for categories listed in a section 1314(m) plan by the simple expedient of removing them from subsequent plans.

## V.

### Conclusion

As we have concluded that 33 U.S.C. § 1314(m) imposes on the EPA a nondiscretionary duty to promulgate ELGs and NSPSs for all categories of sources listed in a plan published pursuant to section 1314(m), whether or not those categories reappear in subsequent section 1314(m) plans, we **GRANT** Plaintiffs' motion for partial summary judgment as to their first claim.

**IT IS SO ORDERED.**